2003 WY 52

**Elizabeth C. SMYTH and Donald G. Smyth, Appellants (Plaintiffs),**

**v.**

**Stephen L. KAUFMAN, M.D. and Michael D. Kellam, M.D., Appellees (Defendants).**

**No. 02–38.**

Supreme Court of Wyoming.

April 30, 2003.

Representing Appellee Kellam: Frank D. Neville and Jason A. Neville of Williams, Porter, Day & Neville, Casper, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1]   Elizabeth Smyth and her husband, Donald, claimed medical malpractice arising out of an alleged misdiagnosis of the cause of compromised blood flow in Mrs. Smyth's left

foot and leg. As a result of the alleged misdiagnosis, Mrs. Smyth's left foot and leg were amputated in three successive medical procedures. In their suit against the doctors involved, the Smyths alleged it was discovered after the amputations that the drug Cafergot caused the decreased blood flow in Mrs. Smyth's left leg and discontinuing the drug would have restored circulation and prevented the amputations.

[¶ 2] After a lengthy trial, the jury returned a verdict with no finding on the question of whether Stephen Kaufman, M.D. and Michael Kellam, M.D. failed to meet the standard of care and answering "no" to the question of whether any such failure caused Mrs. Smyth's injury. The Smyths appeal, claiming abuses of discretion by the trial court in rulings concerning (1) peremptory challenges, (2) admission and exclusion of evidence relating to their claims against a third doctor with whom they settled, and (3) their motion for a new trial based on juror confusion. We affirm.

## ISSUES

[¶ 3] The Smyths present the following issues:

1. Whether it was an abuse of discretion to afford defendants a total of six peremptory challenges and limiting the plaintiffs to only four peremptory challenges?

2. Whether it was an abuse of discretion to allow defendants to elicit evidence and argue to the jury that negligence of Dr. Reckling occurred based simply on the fact that he had been sued by plaintiffs; then, excluding relevant evidence to the contrary from the jury by permitting defendants to omit critical parts of the deposition of plaintiffs' expert that Dr. Reckling's care was acceptable?

3. Whether it was error to deny plaintiffs' motion for new trial based on jurors' belief that their partial verdict would result in a hung jury that would entitle plaintiffs to a new trial?

Dr. Kaufman phrases the issues as follows:

A. Whether the jury verdict may be attacked on the basis of allocation of peremptory challenges when [the plaintiffs] failed to make a record at the time of jury selection of which juror they opposed, passed the jury for cause, failed to challenge the juror in question for cause, and failed to use an available peremptory challenge against her and, in any event, whether the trial court properly allocated peremptory challenges in light of the circumstances and inherent antagonism between the defendants?

B. Whether the trial court properly admitted evidence that plaintiffs originally blamed Dr. Reckling to allow defendants the opportunity to have all actors on the verdict form and avoid the misleading and prejudicial inference that the defendants and not the plaintiffs had blamed Dr. Reckling; whether the evidence of the lawsuit was, in any event, admissible for purposes of showing the bias of Dr. Reckling as a plaintiffs' witness at trial; and whether the trial court properly declined to allow plaintiffs to supplement sworn deposition testimony by reading to the jury a document that was hearsay and without foundation.

C. Whether the trial court properly denied the motion for a new trial because the jury unanimously agreed that the defendants did not cause injuries, plaintiffs waived any irregularities in the verdict by not advising the court, the jurors individually affirmed their verdict when polled, and no improper influence or communication occurred during deliberations.

Dr. Kellam did not set out the issues in his brief.

## FACTS

[¶ 4] On April 3, 1998, Mrs. Smyth, then fifty-one years old, went to the office of Carlton Reckling, M.D. for a follow-up examination after she had a knee replacement and rod surgery on her left leg. She reported experiencing pain, coldness, and discoloration of her left foot. Dr. Reckling noted in her chart that she was suffering from ischemic feet, or lack of blood flow in the feet. He told her she should contact him if the condition worsened and he would arrange for her

to have a vascular evaluation in the emergency room.

[¶ 5]  The next day, April 4, 1998, the pain had worsened, and Mrs. Smyth went to the emergency room.  The emergency room physician ordered an ultrasound, which showed poor arterial flow in her left foot.  He contacted Dr. Reckling as well as Dr. Kellam, the on-call interventional radiology specialist.  Dr. Kellam ordered an angiogram, which showed a blockage and collateral vessels around the left knee and an absence of blood flow from the mid-calf into the foot, symptoms indicative of atherosclerosis and a blood clot.  He administered Priscoline, a vasodilator, to open up the vessels, loosen the clot, or allow blood flow around the blockage.  Although Priscoline is a recognized treatment for vasospasms, Dr. Kellam did not see vasospasms on the angiogram and, therefore, did not administer Priscoline with vasospasms in mind.  In any event, the Priscoline had no effect.  Dr. Kellam reported his findings of atherosclerosis and a blockage, most likely a clot, to Dr. Reckling.  He ordered another medication to be administered through the night in an effort to break up the clot, performed a second angiogram which showed the treatment had no effect, reported those findings to Dr. Reckling, and had no further involvement with Mrs. Smyth.

[¶ 6]  Mrs. Smyth remained in the hospital and, on April 6, 1998, at the request of Dr. Reckling, was seen by Dr. Kaufman, a vascular surgeon, for a vascular consult.  Dr. Kaufman examined Mrs. Smyth's foot, reviewed the angiograms, consulted with Dr. Kellam, and diagnosed Mrs. Smyth as having an ischemic limb related to atherosclerosis and secondary blood clot.  He concluded that surgery to bypass the blockage was not an option.  He advised Dr. Reckling that administering additional medications might possibly restore blood flow but it was likely Mrs. Smyth would need an amputation.  Dr. Kaufman had no further involvement with Mrs. Smyth.

[¶ 7]  Mrs. Smyth remained in the hospital under the treatment of Dr. Reckling.  Her condition continued to deteriorate, and, on April 8, 1998, Dr. Reckling amputated her foot and ankle.  The amputation site failed to heal properly, and, on June 12, 1998, Dr. Reckling performed two more amputations, resulting in an above-knee amputation on her left leg.

[¶ 8]  Two weeks later, Mrs. Smyth began experiencing identical symptoms in her right foot.  Dr. Reckling again requested a vascular consult to address the problem.  Dr. Kaufman's partner, Richard Fermelia, M.D., was the on-call vascular surgeon this time.  Dr. Fermelia examined Mrs. Smyth and reviewed the April angiograms.  He was unable to take a new angiogram because the radiology suite was not in operation and recommended that Mrs. Smyth be transferred to Denver, Colorado.

[¶ 9]  Mrs. Smyth arrived at the University of Colorado Medical Center on June 25, 1998, where she was seen by Thomas Whitehall, M.D.  He ordered an angiogram and immediately concluded Mrs. Smyth was suffering from vasospasms.  After taking steps to return blood flow to her right leg, Dr. Whitehall questioned Mrs. Smyth about what drugs she was taking, specifically migraine headache medication.  Upon learning she was taking Cafergot, he concluded it was the cause of the vasospasms.

[¶ 10]  Prior to Dr. Whitehall seeing Mrs. Smyth, none of the physicians attributed the loss of blood flow in Mrs. Smyth's left leg to the Cafergot she was taking.  Although a list of her medications, including Cafergot, was provided to the hospital when she arrived, Drs. Kellam and Kaufman were not aware she was taking the medication.  On April 7 and 8, 1998, Mrs. Smyth was administered Cafergot by hospital staff.

[¶ 11]  Prior to April of 1998, Mrs. Smyth had been taking Cafergot for migraine headaches for approximately twenty years.  A side effect of Cafergot is vasospasms, or spasming of the blood vessels, which restricts blood flow and can stop the flow of blood to the extremities.  In severe cases of Cafergot toxicity, blood flow to the extremities can be restricted to such an extent that amputation of a limb becomes necessary.  Vasospasms appear in angiograms as long, smooth narrow blood vessels tapering off to nothing.  Neither Dr. Kellam nor Dr. Kaufman saw

vasospasms on the angiograms taken of Mrs. Smyth's left leg in April of 1998.

[¶ 12] On April 4, 2000, the Smyths brought a medical malpractice claim against Drs. Reckling, Kaufman, and Kellam; Stanley Hartman, M.D. (the emergency room physician); and the Board of Trustees of Memorial Hospital of Laramie County d/b/a United Medical Center (UMC) alleging negligence in failing to identify vasospasms on the initial angiogram, misdiagnosis of Mrs. Smyth's condition as atherosclerosis, failure to consider medications—specifically Cafergot—as part of the differential diagnosis, and failure to discontinue Mrs. Smyth's use of Cafergot. The Smyths voluntarily dismissed their claims against UMC and Dr. Hartman. Dr. Reckling settled with the Smyths and was dismissed from the case prior to trial. The case proceeded to trial against Drs. Kaufman and Kellam on June 18, 2001, and a verdict was returned June 29, 2001. The verdict form reflected the jury reached no finding on whether Drs. Kaufman and Kellam failed to meet the standard of care but found any such failure was not the direct cause of injury to Mrs. Smyth. The Smyths filed a motion for a new trial, which the court denied. Judgment on the verdict was entered, and the Smyths timely appealed.

### STANDARD OF REVIEW

[¶ 13] We review the trial court's decisions concerning peremptory challenges, the admissibility of evidence, and whether to grant a new trial for abuse of discretion. *Sanders v. State,* 7 P.3d 891, 893 (Wyo.2000) (admission of evidence); *Cargill, Incorporated v. Mountain Cement Company,* 891 P.2d 57, 65 (Wyo.1995) (peremptory challenges); *Brown v. State,* 816 P.2d 818, 822 (Wyo.1991) (motion for new trial). The ultimate question in determining whether an abuse of discretion has occurred is whether the trial court could have reasonably concluded as it did. *Horn v. Welch,* 2002 WY 138, ¶ 8, 54 P.3d 754, ¶ 8 (Wyo.2002).

### DISCUSSION

**A. Peremptory Challenges**

[¶ 14] The Smyths argue the trial court erred in giving Drs. Kaufman and Kel-lam three peremptory challenges each, for a combined total of six, when the Smyths received only four peremptory challenges. Citing *Cargill,* they claim the trial court was required to make a determination that a good faith controversy existed between Dr. Kaufman and Dr. Kellam before allowing additional peremptory challenges to be exercised by them separately. The Smyths claim no such controversy existed between the doctors who presented a united defense and, therefore, were not entitled to additional peremptory challenges.

[¶ 15] Wyo. Stat. Ann. § 1–11–202 (LexisNexis 2001) provides that, "[i]n the trial of civil cases in the district courts of this state, each side is allowed three (3) peremptory challenges." W.R.C.P. 47(e) provides:

(e) Peremptory challenges. Each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the making of challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

[¶ 16] Applying these provisions in *Cargill,* this court said:

Allocation of peremptory challenges, although resting within the sound discretion of the district court, still requires the district court to determine that a good faith controversy exists between multi-party litigants, be they plaintiffs or defendants, before peremptory challenges are awarded. This rule is intended to prevent multi-party litigants, on the same side, from stockpiling peremptory challenges if their interests are not antagonistic.

891 P.2d at 65. However, the *Cargill* court did not determine whether error occurred in the application of this rule because the appellant failed to indicate which jurors, if any, it would have opposed had the peremptory challenges been allocated differently and, therefore, failed to preserve the issue for appeal. The court quoted the rule from *Goldstein v. Kelleher,* 728 F.2d 32, 38 (1st Cir.1984), that a jury verdict will not be reversed due to improper allocation of per-

emptory challenges "unless the challenging party can 'point to some convincing indication in the record that if a further peremptory challenge had been allowed, [the party] meant to challenge one or more jurors.' " *Id.* We held that "a jury verdict cannot be attacked on the basis of improper allocation of peremptory challenges absent some indication, on the record, of which jurors the challenging party opposed." *Id.*

[¶ 17]   The Smyths argue that, if the trial court had allocated peremptory challenges differently, a particular juror who demonstrated bias would never have been called to sit on the jury.   The juror to whom the Smyths refer was Juror No. 162, the last juror called before the final jury was selected.   During questioning by Dr. Kellam's counsel, Juror No. 162 indicated she was biased against the Smyths' counsel because he repeated the same questions during his *voir dire,* causing her to lose patience with him.   After questions from the Smyths' counsel, she confirmed her impatience with counsel would not prevent her from objectively considering the facts and following the court's instructions.   Despite the juror's expression of bias against him, the Smyths' counsel passed the jury for cause, made no objection to her being seated on the jury, did not exercise the Smyths' final peremptory challenge to exclude her, did not request an additional peremptory challenge so he could exclude her, and answered "yes" when asked whether he was "okay with the 14 [jurors] we've announced."

[¶ 18]   There is nothing in the record to show the Smyths were dissatisfied with Juror No. 162 or wished to select someone else. While they now complain they were given insufficient peremptory challenges to allow them to excuse Juror No. 162, they did not make this point at the time the jury was empaneled or take any action at all to put the trial court on notice of their dissatisfaction. In the absence of an indication that the jury

selected was unsatisfactory to the Smyths at the time it was chosen, we are unwilling to find error.

### B.   Admissibility of Evidence of Claim Against Dr. Reckling

[¶ 19]   The Smyths claim the trial court erred in permitting Dr. Kaufman to present argument and evidence that Dr. Reckling was originally named as a defendant but was no longer a party to the lawsuit.   The Smyths also claim the trial court erred in allowing the defense to present portions of the deposition testimony of the expert witness they retained to testify against Dr. Reckling while not allowing them to read into the record the written expert designation upon which the expert relied for a portion of his testimony.   The effect of these combined errors, the Smyths contend, was to prevent a fair trial, to make it impossible for the jury to properly apply the Wyoming comparative fault statute, and to allow the very type of abuse W.R.E. 408 was designed to prevent.

■   [¶ 20]   The record discloses the following facts relevant to this issue.   The Smyths settled their claims against Dr. Reckling before trial.   At the final pretrial conference on June 15, 2001, Dr. Kaufman's counsel indicated he intended to introduce evidence that the Smyths originally filed a claim against Dr. Reckling alleging he negligently treated Mrs. Smyth, Dr. Reckling was no longer a party to the lawsuit, the Smyths were now "flip-flopping" and pointing the finger at Drs. Kaufman and Kellam, and the Smyths' own expert witness—Anthony Alter, M.D.—concluded Dr. Reckling breached the standard of care in treating Mrs. Smyth.[1]   In response to defense counsel's statement that he did not intend to offer evidence of the settlement but would offer evidence that Dr. Reckling had been but was no longer a defendant, the trial court stated that evidence

---

1.   Defense counsel's statement that the Smyths "flip-flopped" is misleading.   In their original complaint, the Smyths alleged all three physicians—Drs. Kaufman, Kellam, and Reckling—were negligent, as they were entitled to do under our liberal pleading rules.   W.R.C.P. 8; *Haderlie v. Sondgeroth,* 866 P.2d 703, 714 (Wyo.1993). The implication that they initially "pointed the

finger at" Dr. Reckling and now, having settled with him, were blaming Drs. Kaufman and Kellam is not accurate.   However, defense counsel chose his words more carefully in front of the jury, and, therefore, his comments to the trial court out of the jury's hearing are not grounds for reversal.

of the settlement was "out of bounds." The Smyths argued that, if the court intended to allow evidence that Dr. Reckling was sued, evidence of the settlement, but not the settlement amount, also ought to be allowed. The court indicated that, in its view, evidence of the settlement was irrelevant. The trial court ruled the doctors would be allowed to show the Smyths had sued Dr. Reckling and he was no longer a party. Crucial to the trial court's ruling was its concern that unfairness would result if it appeared to the jury that Drs. Kaufman and Kellam were "pointing the finger" at Dr. Reckling rather than that the Smyths had sued him for negligence.

[¶ 21] Despite the trial court's ruling and defense counsel's stated intent to tell the jury in opening statement that Dr. Reckling had been a defendant, the Smyths' counsel made no mention in his opening statement of the fact that Dr. Reckling, in addition to Drs. Kaufman and Kellam, was named as a defendant in the original complaint. Dr. Kaufman's counsel, however, made the following comments during his opening statement:

Well, one of the things that plaintiffs' counsel have not yet told you is that over a year ago when they filed this lawsuit against Dr. Kellam and Dr. Kaufman they also filed a lawsuit against Dr. Reckling, the orthopedic surgeon; and they sued Dr. Reckling. He was a defendant in this lawsuit until just recently. They claimed they hired an expert by the name of Dr. Alter, plaintiffs did, an orthopedic surgeon from Beverly Hills, Los Angeles.

We went out to Beverly Hills and took his deposition. He testified that Dr. Reckling was negligent for not referring the patient on Friday, the 3rd, and that he was negligent for not taking the patient off Cafergot, ... to order a patient could be on Cafergot while in the hospital.

Ladies and gentlemen, those are the claims of the plaintiffs, not Dr. Kaufman and not Dr. Kellam. Neither Dr. Kaufman nor Dr. Kellam assert that Dr. Reckling was negligent. But now the plaintiffs assert only the negligence of Dr. Kaufman and Dr. Kellam.

The Smyths did not object at the time the comments were made but objected on the basis of relevancy out of the presence of the jury following opening statements.

[¶ 22] On the third day of trial, the Smyths called Dr. Reckling to the witness stand. During direct examination, they made no mention of the fact that Dr. Reckling had been a defendant, nor did they mention it at any time during the trial. During cross-examination of Dr. Reckling by Dr. Kaufman's counsel, however, the following exchange occurred:

Q. But plaintiffs have not always been so willing to be supportive of your care in this case, have they? In fact you were a defendant in this lawsuit once; is that correct?

A. I was.

Q. And in fact they alleged, through an expert witness, that you should not have had—kept the patient on Cafergot, correct? That was one of their allegations?

A. That is correct.

Q. And they alleged that you should have made a referral to a vascular surgeon earlier than you did; is that correct?

A. That allegation was made.

Q. And they alleged that you should not have allowed the Cafergot to be in the orders in the hospital, they made that allegation?

A. That is correct.

After Dr. Reckling's testimony, the trial court asked counsel to approach the bench and informed them the following question had been received from one of the jurors: "Why is Dr. Reckling no longer a defendant in this case?" The Smyths objected to the admission of evidence of their claims against Dr. Reckling. The trial court overruled the objection, letting stand its prior ruling that Dr. Reckling's former status as a defendant was admissible.

[¶ 23] The next day, the trial court read the following instruction to the jury:

Wyoming law requires the jury to consider the conduct of those individuals, whether or not parties, who may have contributed to the damages sustained by plaintiff. So you may be called upon to

judge the conduct not only of Dr. Kaufman, Dr. Kellam, and Mrs. Smyth, but also Dr. Reckling and possibly others. How you do this will be explained at the close of the evidence by further instruction.

You have heard evidence that Dr. Reckling was, but no longer is, a defendant. That evidence was admitted for a limited purpose—to show that plaintiffs and not the defendant physicians, Drs. Kaufman and Kellam, were initially critical of Dr. Reckling's care.

Your task is difficult enough, and you must focus upon the conduct of those individuals who may have contributed to the Smyths' damages and not be concerned about why Dr. Reckling is no longer a party. The reason that Dr. Reckling is no longer a defendant is not an issue for you to consider, and you should draw no inference from it concerning Dr. Reckling's medical care of Mrs. Smyth.

The fact that Dr. Reckling was joined as a defendant and now is no longer a party does not mean that his care was below acceptable standards. That question must be resolved solely by reference to expert medical testimony which may be offered in the trial.

A copy of the instruction was provided to the jury at the close of the evidence as part of the jury instruction packet. The Smyths objected to the instruction on the following basis:

[I]t directs the jury to make an inference. And that is an inference that if we bring a party in, Your Honor, and settle them out for any purpose, whether it be $1, $100, or a million dollars, that they are now to infer from that they were critical and thereby make an assumption that he was negligent.

And under our pleading laws, our rule on pleadings, you're entitled to plead in the alternative. You're entitled to bring parties in and dismiss them. In the absence of telling the jury that there was a settlement and why there was a settlement the jury should be not permitted to assume, to make inferences from the fact that parties were named and dismissed at any time.

The trial court overruled the objection and adhered to its earlier ruling. During closing argument, Dr. Kaufman's counsel reiterated his earlier statements concerning the Smyths' claims against Dr. Reckling.

[¶ 24] With this factual background in mind, we turn to the question of whether the trial court abused its discretion in allowing evidence that Dr. Reckling had been, but was no longer, a defendant in the Smyths' lawsuit. It is well established that evidence of settlement is not admissible to prove liability for or invalidity of a claim or its amount. W.R.E. 408; *Haderlie v. Sondgeroth,* 866 P.2d 703, 713 (Wyo.1993). It is also well established, however, that, under Wyoming's comparative fault scheme, a jury is entitled to apportion the fault of all those whose acts proximately caused injury to the claimant—parties and nonparties alike. Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2001). We must decide where on this continuum the admission of evidence of Dr. Reckling's former party status lies; that is, did it raise the inference of settlement such that it ought to have been excluded for the reasons underlying W.R.E. 408, or was it properly admissible under the comparative fault scheme as probative of any relevant fact such as bias or prejudice of a witness?

[¶ 25] We consider first the applicability of W.R.E. 408 (emphasis added), which provides as follows:

Evidence of (1) *furnishing or offering or promising to furnish, or* (2) *accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed* as to either validity or amount, *is not admissible to prove liability for or invalidity of the claim or its amount.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Thus, W.R.E. 408 prohibits evidence of the settlement of disputed claims for the purpose of proving liability.

[¶ 26] In *Haderlie*, this court addressed very nearly the same issue we are asked to decide in this case. The plaintiff in that case originally named four defendants, two of whom settled prior to trial. 866 P.2d at 707. The remaining defendants sought to introduce the pleadings and settlement agreements showing the plaintiff originally claimed others were negligent. With respect to the settlement agreements, this court quoted from 2 J. Weinstein, Weinstein's Evidence ¶ 408[05] at 408 (1991): " 'The almost unavoidable impact of the disclosure of such evidence is that the jury will consider the offer or agreement as evidence of a concession of liability.' " 866 P.2d at 713. This court also said: "Because of the potential prejudice, 'when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers.' " *Id.* (quoting *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987)). Addressing the issue of the admissibility of the pleadings, this court quoted with approval *Whatley v. Armstrong World Industries, Inc.*, 861 F.2d 837, 839 (5th Cir.1988): "[R]eliance on the pleadings was not proper because the pleadings 'provide little real evidence of the liability of the settling defendants, [and] they provide no evidence upon which a jury could determine the percentage or extent of liability.' " *Id.* at 714. Holding neither the settlement agreements nor the pleadings were admissible, we said: "[T]he ... attempts to introduce the pleadings into evidence were in reality an attempt to allude to the settlement agreements which were inadmissible. The trial court properly refused admission of the settlement agreements and pleadings." *Id.*

[¶ 27] To the extent Dr. Reckling's prior party status was introduced to prove his liability, the same result is mandated here. Evidence that the Smyths initially claimed Dr. Reckling was negligent was not probative of his liability. It had no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. Like the pleadings in *Haderlie*, evidence that the Smyths initially brought a negligence claim against Dr. Reckling provided no real evidence of his liability and provided no evidence upon which a jury could determine the percentage or extent of his liability. *Haderlie*, 866 P.2d at 714. Particularly in a medical malpractice case, where expert opinion testimony is required in order to prove the claim, *Siebert v. Fowler*, 637 P.2d 255, 257 (Wyo.1981), the plaintiff's lay opinion that a doctor was negligent has no relevance. We hold, therefore, that, to the extent the evidence was introduced to prove Dr. Reckling's liability, the trial court erred in admitting it.

[¶ 28] While disallowing evidence of settlement to prove liability, W.R.E. 408 does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice. Thus, evidence that Dr. Reckling had been but was no longer a defendant would have been admissible if offered to prove his testimony at trial was biased or prejudiced.[2] However, from the testimony elicited from Dr. Reckling concerning the Smyths' claims against him, it does not appear the evidence was presented for that purpose. Counsel limited his questions to the fact that Dr. Reckling had been a defendant and the Smyths claimed he should have discontinued the Cafergot and not allowed the drug to appear on the hospital orders. These questions appear to address Dr. Reckling's liability, not bias or prejudice. They were, therefore, improper, and the testimony they elicited was inadmissible. We hold, however, in light of the other evidence presented, the error in allowing the evidence was harmless. W.R.C.P. 61; W.R.E. 103; W.R.A.P. 9.04.

[¶ 29] Even when this court determines that the trial court erred in ruling on the admissibility of evidence, we disregard errors which are harmless. *Rudy v. Bossard*, 997 P.2d 480, 483 (Wyo.2000). An error warrants reversal only when it is prejudi-

---

2. If the testimony was presented to prove bias or prejudice, the trial court properly should have allowed the Smyths to present evidence on redirect that Dr. Reckling had settled. So long as the evidence is not offered to prove liability, a trial court's decision to allow evidence of settlement to prevent juror confusion is not an abuse of discretion. *Belton v. Fibreboard Corporation*, 724 F.2d 500, 505 (5th Cir.1984).

cial and it affects an appellant's substantial rights. *Id.* For error to be regarded as harmful and reversible, there must be a reasonable probability that, in the absence of the error, the verdict might have been different. *TZ Land & Cattle Co. v. Condict,* 795 P.2d 1204, 1210 (Wyo.1990). Where the disputed evidence is a small part of the case, the trial is lengthy and complicated, and there is substantial evidence supporting the result, we are not inclined to find harmful error in the admission of evidence. *Herman v. Speed King Manufacturing Company,* 675 P.2d 1271, 1278 (Wyo.1984).

[¶ 30] The trial of this matter lasted ten days. The jury heard the testimony of four lay witnesses, fourteen medical doctors, and two other expert witnesses. From this testimony, there was substantial evidence from which the jury could conclude that neither Dr. Kaufman nor Dr. Kellam caused Mrs. Smyth's injuries.

[¶ 31] Dr. Kellam testified he was called in on Saturday, April 4, 1998, to perform an angiogram, assess the blood supply to Mrs. Smyth's leg, and report back to Dr. Reckling. He testified he concluded from the angiogram that her symptoms were consistent with a blood clot or atherosclerosis and did not see anything suggesting vasospasms. After reporting back to Dr. Reckling on Sunday, April 5, 1998, Dr. Kellam had no further involvement with Mrs. Smyth. Charles Seibert, M.D., the expert witness called on Dr. Kellam's behalf, testified he agreed with Dr. Kellam's diagnosis of atherosclerosis, did not see evidence of vasospasms on the angiogram, and believed Dr. Kellam met the standard of care for an interventional radiologist in his diagnosis and treatment of Mrs. Smyth.

[¶ 32] Dr. Kaufman testified he was called in by Dr. Reckling to see Mrs. Smyth on Monday, April 6, 1998, for the purpose of determining whether surgery could be done to restore circulation to her left leg. After reviewing the angiograms, examining Mrs. Smyth, and consulting with Dr. Kellam, Dr. Kaufman concluded Mrs. Smyth was suffering from atherosclerosis and a blood clot. He did not see vasospasms on the angiogram. He further concluded that nothing could be done surgically to resolve Mrs. Smyth's problem and amputation might be necessary. He discussed his findings with Dr. Reckling and had no further involvement with Mrs. Smyth. The testimony from Dr. Kaufman and his expert was that, by the time he was consulted, it was too late to save Mrs. Smyth's leg. The pathologist testified the pathology report confirmed the limb was dead on April 6, 1998. James Anderson, M.D., the expert witness called on Dr. Kaufman's behalf, testified that, in his opinion, Dr. Kaufman's treatment and diagnosis met the standard of care for vascular surgeons.

[¶ 33] In addition to this testimony, there was evidence that Mrs. Smyth was in poor health, had a complex medical history, was taking numerous medications, had been taking Cafergot for approximately twenty years, had been a heavy smoker for many years, was inactive, and had undergone two recent left leg surgeries leaving her even more inactive. There was testimony that, one week before the April 1998 hospital admission, Mrs. Smyth was taken to the emergency room because of hallucinations possibly associated with taking more Cafergot than the recommended dosage. The medical records also reflect that, prior to her discharge on that occasion, her physician discontinued several of her medications, including Cafergot. The medical records further reflect she did not have Cafergot again until it was administered to her in the hospital on April 7, 1998. A medical toxicologist testified the vasospactic effects of Cafergot typically begin to resolve in one to three days after the patient stops taking the drug, meaning blood flow to her left leg should have returned prior to the April admission if Cafergot was the cause. Expert testimony indicated the leading cause of ischemic legs and limb loss is smoking. There also was evidence that knee surgery can cause blood clots to form and block blood supply to the lower leg. There also was properly admitted deposition testimony from Dr. Alter, as well as live testimony from other expert witnesses, that Dr. Reckling's treatment of Mrs. Smyth fell below the standard of care.

[¶ 34] A thorough review of the record leads to the conclusion that substantial evi-

dence was presented from which the jury could reasonably conclude factors other than any acts or omissions of Drs. Kaufman or Kellam caused Mrs. Smyth's injuries. We, therefore, are unable to conclude a reasonable probability existed that the verdict might have been different in the absence of evidence that Dr. Reckling was sued. Given the substantial evidence of other likely causes, including properly admitted expert testimony that Dr. Reckling was negligent in his treatment of Mrs. Smyth, we simply see no connection between the erroneously admitted evidence and the jury's finding of no causation by Drs. Kaufman and Kellam. We conclude, therefore, that admission of the evidence was harmless.

[¶ 35] In reaching this conclusion, we also note the trial court's instruction to the jury adequately apprised the jurors of their responsibility under Wyoming law to consider the fault of all individuals whose conduct contributed to Mrs. Smyth's injuries—including Dr. Reckling, of the limited purpose for which the evidence that he had been but was no longer a defendant was admitted, and that they should not concern themselves with or draw any inferences from the fact that he was no longer a defendant. The instruction also informed the jury that the fact that Dr. Reckling was a defendant did not mean his care was below acceptable standards. We assume the jury followed the court's corrective instruction. *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, 664 P.2d 27, 36 (Wyo.1983).

[¶ 36] The Smyths also claim the trial court abused its discretion in allowing Dr. Kaufman to present deposition testimony of Dr. Alter, the expert witness they retained to testify that Dr. Reckling breached the standard of care, while precluding them from reading into the record a portion of the expert designation upon which he relied for part of his testimony. The expert designation stated in pertinent part as follows:

(3) Dr. Reckling was reasonable in relying on the opinions of the interventional radiologist, Dr. Kellam and the physician called for a vascular consult, Dr. Kaufman, in evaluating the etiology of symptoms and designing a treatment plan for Ms. Smyth.

If there was doubt about the ability to diagnose the patient's source of symptoms from angiography, it was incumbent on Drs. Kellam and/or Dr. Kaufman to suggest referral to another facility for definitive diagnosis before irreversible amputation was performed.

During the deposition of Dr. Alter, a copy of the designation was marked for identification as an exhibit but was retained by the Smyths' counsel. It was not read into the record or made part of the deposition transcript. Dr. Alter was questioned about the designation during the deposition as follows:

Q. Your third opinion is about Dr. Reckling relying upon Dr. Kellam and Dr. Kaufman, which seems fairly straightforward to me.

A. You are referring to—

Q. To No. 3.

A. In?

Q. In your designation.

A. In comments or conclusions?

Q. In your designations.

A. I'm sorry. Go ahead.

Q. It refers to Dr. Reckling relying upon the opinions of Dr. Kellam and Dr. Kaufman. Is that opinion as straightforward as it appeared in the designation?

A. May I read the designation?

Q. Sure.

A. That's correct.

[¶ 37] Prior to trial, the Smyths moved to have the deposition of Dr. Alter excluded or, in the alternative, to allow only those portions read which were within their expert designation. At the pretrial conference, the trial court ruled that Dr. Alter's deposition could be read by the defense. During trial, the Smyths filed a motion in part asking the trial court to allow the expert designation read and relied upon by Dr. Alter during his deposition to be read to the jury when the deposition was read. The trial court ruled that they would not be allowed to "supplement sworn testimony [with] unsworn testimony."

[¶ 38] With regard to exhibits used during the deposition of a witness, W.R.C.P.

30(f)(1) (emphasis added) provides in relevant part:

> Documents and things produced for inspection during the examination of the witness shall, upon the request of a party, be marked for identification and annexed to the deposition ... *except that if the person producing the materials desires to retain them the person may:* (A) offer copies to be marked for identification and annexed to the deposition and to serve thereafter as originals ...; or (B) *offer the originals to be marked for identification,* after giving to each party an opportunity to inspect and copy them, *in which event the materials may then be used in the same manner as if annexed to the deposition.*

Pursuant to this rule, the fact that the exhibit was not attached to the deposition is not grounds for excluding it at trial. Rather, the Smyths' counsel was entitled to retain the original expert designation after having it marked for identification and giving defense counsel an opportunity to inspect it. It could then be used in the same manner as any other exhibit annexed to the deposition.

[¶ 39] Pursuant to W.R.C.P. 32(a), any part or all of a deposition, *so far as admissible under the rules of evidence,* may be used at trial in accordance with specified criteria. The expert designation the Smyths sought to have read to the jury was prepared by their attorney, not by Dr. Alter. It was a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. As such, it was inadmissible hearsay and was properly excluded. W.R.E. 801(c). Moreover, even assuming reading of the designation was improperly denied, there were other options available to the Smyths to supplement or refute Dr. Alter's deposition testimony of which they chose not to avail themselves. Presumably, since Dr. Alter was their expert, they could have arranged for him to appear at the trial and had him read or testify to his designated opinions in person, including his opinion that Dr. Reckling was entitled to rely on the opinions of Drs. Kaufman and Kellam. Under these circumstances, we find no error in the trial court's denial of the Smyths' request to read the designation into the record. In reaching this result, we note also that there was testimony from expert witnesses other than Dr. Alter concerning Dr. Reckling's negligence. In light of this testimony and all the evidence presented, we are not convinced the trial court's ruling concerning the designation had any real effect on the outcome.

## C. Motion for a New Trial

[¶ 40] The events leading up to the Smyths' motion for a new trial began on the second day of jury deliberations when the jury foreman notified the bailiff that the jury was unable to come to a consensus on the standard of care issue.[3] Upon learning the jury was deadlocked, the trial court directed the bailiff to contact trial counsel and ask them to be present in the courtroom at two o'clock that afternoon for a further instruction to the jury. It appears from the record that the bailiff informed the jurors that the trial court would talk with them at two o'clock. When counsel arrived just before two o'clock, the trial court advised them it had just received the following note written by the jury foreperson:

> While we unanimously agree that the two defendants were not responsible for the direct cause of injury, we cannot come to a consensus on the standard of care issue (Question # 1). Repeatedly we come to a 10/4 vote. I am at a point that I don't

---

**3.** The trial court received earlier communications from the jury as well. The previous afternoon, not long after beginning deliberations, the jury sent out a note requesting a drug book. The trial court, without consulting counsel, instructed the bailiff to inform the jury the evidence consisted of the testimony and the exhibits and it would not be allowed to consider anything not introduced as evidence. A short time later, the jury requested Dr. Kaufman's and Dr. Kellam's depositions. This time the trial court called counsel in and, after consulting with them, advised the jurors they must rely on their own recollections. Later that evening, the jurors advised the bailiff that they could not reach a unanimous decision and wanted to go home for the night and come back in the morning. The trial court allowed them to go home; they began deliberations again the next morning; and, at approximately 11:30 a.m., the foreperson informed the court they could not reach an agreement on the standard of care issue.

know what to do to further our deliberations in a constructive fashion.

The trial court discussed the note with trial counsel and then instructed the jury as follows: "If the jury has reached a unanimous vote on Question No. 2, . . . then answer only that question, sign the verdict form, and report to the bailiff." During the discussion and before instructing the jury, the trial court asked for input from the Smyths. Although they indicated the jury's note was inconsistent, they also stated they had "no problem" with the trial court's proposed response and told the court to "just do it." They made no objection, nor did they suggest some other response or that the proposed response was improper.[4] Ten minutes later, the jury returned the following verdict:

### Verdict

We the jury, duly empaneled and sworn to try the above entitled cause, do find by a preponderance of the evidence as follows:

1. Do you find that any of the physicians below failed to meet the standard of care?

| | | | |
|---|---|---|---|
| Stephen Kaufman, M.D. | Yes ___ | No ___ |
| Michael Kellam, M.D. | Yes ___ | No ___ |

If you answer "No" for both Dr. Kaufman and Dr. Kellam, then sign the verdict and report to the bailiff. If you answer "Yes" for either Dr. Kaufman or Dr. Kellam, then answer Question Number 2.

2. Did such failure amount to a direct cause of injury to Elizabeth Smyth?

| | | | |
|---|---|---|---|
| Stephen Kaufman, M.D. | Yes ___ | No X |
| Michael Kellam, M.D. | Yes ___ | No X |

If you have answered "No" for both Dr. Kaufman and Dr. Kellam, then sign the verdict form and report to the bailiff. If you answered "Yes" as to either Dr. Kaufman or Dr. Kellam, then proceed to Question Number 3.

The jury foreperson left the remaining paragraphs blank and signed and dated the verdict form.

[¶ 41] Before reconvening the jury, the trial court reviewed the completed verdict form with counsel. Upon reading the verdict, the Smyths' counsel's only comment was: "Your Honor, that's a defense verdict." The trial court then called the jury back into the courtroom and had the clerk of court read the verdict and poll the jury. Prior to polling the jury, the trial court asked the jurors the following question: "Do you understand that by answering the Question No. 2 as you did that you have ruled in favor of the defendants and against the plaintiff?" The Smyths entered no objection to the question posed by the trial court. As they were polled, each juror responded, "yes." When the polling was complete, the trial court excused the jury and adjourned the proceedings. At no time during the proceedings did the Smyths voice any objection to or seek clarification of the jury verdict.

[¶ 42] After the verdict, the Smyths filed a motion for a new trial pursuant to W.R.C.P. 59 in which they asserted they were entitled to a new trial based upon irregularity in the proceedings which, they contended, led to juror confusion and denial of a fair trial. With their motion, they filed the affidavits of four jurors and an e-mail message from the juror foreperson. Essentially, the Smyths claimed the verdict was not truly unanimous because four jurors compromised on the causation question believing the result would be a hung jury since they did not reach a verdict on the standard of care question. The Smyths contended that, by instructing the jury to answer only the causation question, the trial court improperly rewrote the verdict form, which as written required the jury to answer Question No. 1 on the standard of care before answer-

---

4. The Smyths argue error occurred when the trial court failed to communicate to counsel that the jury was deadlocked earlier that morning and instead told the bailiff to inform the jurors that the court would talk to them at two o'clock and to have counsel present in the courtroom at that time. The Smyths claim that, if they had been informed of the morning deadlock, they would never have agreed to the trial court's proposed instruction. The record demonstrates the Smyths' counsel were informed at two o'clock in the afternoon that the jury was deadlocked. With that knowledge, they agreed to the proposed instruction. We are unable to see how the time lapse caused counsel to respond differently than they would have had the court met with them and proposed the instruction two and a half hours earlier.

ing Question No. 2 on causation. Despite the fact that the four jurors responded affirmatively to the trial court's question as to whether they understood they had found for the defendants by answering Question No. 2 "no," the Smyths asserted the jurors did not understand that to be the effect of their verdict. After a hearing, the trial court denied the motion for a new trial.

[¶ 43] The Smyths basically present the same argument to this court as they presented below, to no avail. This court has consistently imposed a duty upon counsel to object to any claimed inconsistency or mistake in the verdict before the jury is dismissed. *Big–O Tires, Inc. v. Santini,* 838 P.2d 1169, 1175 (Wyo.1992). Failure to object to any substantive defect in the verdict when it is returned to the trial court is a waiver of the right to do so. *Goggins v. Harwood,* 704 P.2d 1282, 1291 (Wyo.1985). In the present case, before a final verdict was entered, the Smyths' counsel recognized a problem with the jury's unanimous vote on causation and inability to reach agreement on the standard of care. Yet they made no objection to the trial court's proposed instruction and offered no alternative suggestions for resolving the inconsistency. Instead, counsel indicated they had no problem with the trial court's proposed instruction and urged the trial court to "just do it." When the trial court "did it" and the jury returned its final verdict and was polled, counsel still entered no objection and made no effort at all to obtain clarification despite claiming, in the post trial motions, they observed one juror shaking his head and mouthing the word "no" at the same time he answered the trial court's question "yes." Counsels' lack of assertion of any problem with the verdict before the jury was dismissed had the effect of closing the book. If the Smyths' counsel believed the verdict was inconsistent, unclear, or in any way improper at the time it was rendered, they were charged with the duty of raising the issue at the trial level before the jury was discharged. *Big–O Tires,* 838 P.2d at 1175–76. They did not do so then and cannot do so now. *Thunder Hawk By and Through Jensen v. Union Pacific Railroad Company,* 891 P.2d 773, 784 (Wyo.1995).

[¶ 44] We turn to the claim that juror confusion became apparent after the trial when the jurors communicated by e-mail with the Smyths' counsel and, for that reason, counsel were not in a position to object before the jury was dismissed. Upon receiving the e-mails, the Smyths' counsel obtained affidavits from four of the jurors, which they attached to the motion for a new trial. The relevant portion of each affidavit stated:

5. Prior to the Judge meeting with us at 2:00 pm, the Jury still could not come to an agreement regarding the standard of care in question no. 1 of the verdict form. I felt the jury was "hung" because the jury could not agree to question no. 1.

6. The verdict form provided to us required that we answer question no. 1 before we could move on to question no. 2.

7. Believing that it made no difference because the jury was deadlocked, and relying upon the form of the verdict, I compromised with other jurors and agreed to vote in favor of the defendants regarding causation in question no. 2 of the verdict.

8. I would never have agreed to a compromise vote on question no. 2 if I had been informed by the Court that to do so would not result in a hung jury.

The affidavits go on to make various other assertions concerning the jurors' mental processes as the verdict was read and the jury was polled.

[¶ 45] W.R.E. 606(b) provides as follows:

Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received, but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside

influence was improperly brought to bear upon any juror.

W.R.E. 606(b) could not be any clearer. The only time a juror affidavit is appropriate is when extraneous prejudicial information was improperly brought to a juror's attention or outside influence was brought to bear upon a juror. There is no evidence here of either. Instead, the affidavits contain averments concerning matters occurring during the course of the jury's deliberations, the effect of the trial court's instruction on the verdict, and the jurors' mental processes. The affidavits were, therefore, improper.

## CONCLUSION

[¶ 46] The trial court did not abuse its discretion in ruling on peremptory challenges or denying the Smyths' motion for a new trial. The admission of evidence that Dr. Reckling had been but was no longer a party was improper; however, the record does not support a finding of a reasonable probability that the verdict would have been different had the improper evidence not been admitted.

[¶ 47] Affirmed.

VOIGT, Justice, dissenting, with whom LEHMAN, Justice, joins.

[¶ 48] I respectfully dissent from the majority's resolution of the second issue. I would also dissent from the resolution of the third issue, had the appellants not waived that issue in the district court.[1] I would reverse.

[¶ 49] This case is a perfect example of our judicial system's stated reverence for, but frequent distrust of, decision-making by juries. The second issue, in simple terms, is whether the district court abused its discretion in deciding how much of the truth to tell the jury about Dr. Reckling. The scenario is not complicated. The appellants sued three doctors, one of whom settled before trial. If the jury were entitled to the whole truth, that would be it. However, because we want to encourage settlements, and because settle-

ments may be irrelevant to liability, W.R.E. 408 forbids introduction of evidence of a settlement to prove the liability of the settling defendant. *Haderlie v. Sondgeroth,* 866 P.2d 703, 713 (Wyo.1993). If that is going to be the law, we should enforce it, rather than allowing one side to make contrary hints to the jury. The appellee doctors' meager plea that "it ain't fair" should not have outweighed the law.

[¶ 50] I would hold that it was not harmless error when the district court abused its discretion by allowing Dr. Kaufman's counsel to state in opening that "when [the appellants] filed this lawsuit against Dr. Kellam and Dr. Kaufman they also filed a lawsuit against Dr. Reckling, the orthopedic surgeon; and they sued Dr. Reckling." This error was compounded when, in answering the jury's question, the district court instructed it, in part, as follows: "You have heard evidence that Dr. Reckling was, but no longer is, a defendant. That evidence was admitted for a limited purpose—to show that plaintiffs and not the defendant physicians, Drs. Kaufman and Kellam, were initially critical of Dr. Reckling's care." I agree with the majority that this situation is sufficiently similar to that in *Haderlie* as to be indistinguishable for the purpose of applying the law. Under *Haderlie,* neither the settlement agreements nor the pleadings were admissible. *Id.* at 714. Neither are they here. And, as in *Haderlie,* Dr. Kaufman's attorney's opening statement was nothing more than a poorly disguised attempt to tell the jury that the real culprit had settled out. *Id.*

[¶ 51] The question of who first pointed the finger of liability at Dr. Reckling—the appellants or the other appellee doctors—was simply not relevant to any issue of fact to be determined by the jury. I might be able to agree with the majority that the error in allowing the appellee doctors to pursue this argument was harmless had it not led directly to admission of Dr. Alter's deposition testimony, the only purpose of which was to prove Dr. Reckling's liability. The final ef-

---

1. The jury could not agree to find any "failure," but then found "such failure" not to have caused injury to the appellants. That, of course, is a logical inconsistency, and it should have been

more thoroughly explored before the jury was excused. We ask precise questions on verdicts because precise answers are required.

fect of the erroneous ruling was to allow the jury to infer that Dr. Reckling had settled because he was liable.[2] That is exactly the inference that we are trying to avoid by disallowing evidence of pleadings and settlements.

[¶ 52] Cases like the present one should give us pause to reconsider what we do and do not tell juries. We should recognize that jurors are not stupid, and when they are given only part of the truth, they are likely to ask questions.[3] Not surprisingly, the jurors in the instant case wanted to know why Dr. Reckling was no longer a defendant.[4] This problem could have been avoided had the judge given, at the outset of the trial, a pattern jury instruction along the lines of Wyo. Stat. Ann. § 1–1–109(a)(i) (LexisNexis 2001), which defines "actor" to include anyone "whose fault is determined to be a proximate cause of the death, injury or damage, whether or not the actor is a party to the litigation[.]" Had such an instruction been given, and had the irrelevant evidence about the initial complaint not been admitted, any jury question about Dr. Reckling's status could have been answered with a simple "it does not matter so do not consider it." An alternative approach would be to advise the jury outright that Dr. Reckling had settled, but that a settlement may not be based on liability, and therefore may not be considered by the jury for any reason. Without debating the relative merits of either approach, it does seem safe to say that either is preferable to what happened in the present case.

---

**2.** There is the additional inference, of course, that Drs. Kaufman and Kellam did *not* settle because they were *not* negligent. If defendants are allowed to pursue such arguments, the inclination of plaintiffs to settle with fewer than all defendants will certainly be reduced, and the public policy favoring settlement of civil disputes will be violated.

**3.** Or worse, they may fill in the blanks with their own suppositions.

**4.** Needless to say, they would not have had to ask that question had they not been told that he had once been a defendant.