# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 127

OCTOBER TERM, A.D. 2019

December 18, 2019

IN THE MATTER OF THE
TERMINATION OF PARENTAL
RIGHTS TO:  LDB, TJB, and JCB,
minor children,

SHERYL LYNN ELLIS,

Appellant
(Respondent),

v.                                                                          S-19-0050

STATE OF WYOMING,
DEPARTMENT OF FAMILY
SERVICES,

Appellee
(Petitioner).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Donna D. Domonkos, Domonkos Law Office, LLC, Cheyenne, Wyoming

*Representing Appellee:*
    Bridget Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney
    General; Jill E. Kucera, Senior Assistant Attorney General; Rashell Read, Assistant
    Attorney General. Argument by Ms. Read.

*Guardians ad Litem:*
    Dan S. Wilde, Deputy State Public Defender; Hope Mead, Guardian *ad Litem*,
    Wyoming Guardian *ad Litem* Program. Argument by Ms. Mead.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*DAVIS, C.J., delivers the opinion of the Court; FOX, J., files a specially concurring opinion, in which BOOMGAARDEN, J., joins.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice.**

[¶1]    Following a jury trial, the district court entered an order terminating the parental rights of Sheryl Ellis (Mother) to her three minor daughters.  Mother contends the court erred in allocating peremptory challenges and in admitting evidence of the children's sexual abuse allegations.  We find no reversible error and affirm.

## ISSUES

[¶2]    Mother presents two issues on appeal, which we restate as:

> I.    Did the district court abuse its discretion when it failed to equalize peremptory challenges by either giving Mother additional challenges or requiring the Department of Family Services and guardian *ad litem* to share challenges, and if so, is the error reversible?
>
> II.    Did the district court abuse its discretion when it admitted evidence of the children's sexual abuse allegations and excluded evidence that the allegations were not substantiated?

## FACTS

[¶3]    In January 2016, Mother was sole custodian of her three minor daughters, LDB, TJB, and JCB.[1]  LDB was born in 2002, and TJB and JCB were twins born in 2004.  On January 4, 2016, law enforcement received a call from one of the daughters seeking help because Mother was intoxicated.  Deputies Mark Yocum and Aaron Scott of the Laramie County Sheriff's Office responded to the Ellis home and found Mother extremely intoxicated.  Because Mother had done nothing criminal by being intoxicated in her home, the officers did not arrest her.  They informed her that they would take the girls to school and would arrange for them to ride the bus home after school.

[¶4]    At around 3:30 to 3:45 that afternoon, Deputy Yocum received a report that Mother had driven to the girls' schools to look for them.  He then set out for the Ellis home to ensure that the girls had arrived home safely, and on the way he found Mother in her vehicle parked in the middle of the road.  He pulled over and approached her and found that she still appeared intoxicated, with slurred speech, glassy and bloodshot eyes, and a strong odor of alcohol.  Mother denied having consumed alcohol that afternoon, but she admitted to having taken Percocet.  Deputy Yocum then conducted field sobriety tests, and after

---

[1] The children's father died in 2015.

1

Mother failed those, he arrested her on a charge of felony driving under the influence (DUI).[2]

[¶5]   During Deputy Yocum's interaction with Mother, Deputy Scott arrived to provide backup. Deputy Scott then went to the Ellis home and confirmed that the children had made it home safely by bus. The deputies then arranged to have Mother's mother take custody of the girls.

[¶6]   The next day, Officer Daniel Zabriskie of the Cheyenne Police Department, the school resource officer at LDB's junior high, spoke with LDB concerning her mother's arrest. He thereafter decided to take LDB and her sisters into protective custody.

>   Obviously, I checked in with [LDB], going to see how the evening had gone, discovered that Ms. Ellis had been arrested by the deputies that evening. Confirmed that [the girls] had gone to their grandma's, so you know, they had a safe place to be, you know, warm and fed and all of that. However, knowing that [their] father had passed away and that Ms. Ellis was the only person who had legal custody of the children, I consulted with my sergeant throughout the day, and then confirmed with the Detention Center that Ms. Ellis was not being released that day; that there was a bond that could be posted, and I couldn't contact anybody who – anybody in Ms. Ellis' life who was willing to post that bond at the time.
>
>   Because there was nobody immediately available, you know, to make legal decisions or medical decisions or educational decisions for those three kids, I took them into protective custody, you know, contacted the District Attorney, did the paperwork and contacted DFS.

[¶7]   On January 6, 2016, the Laramie County district attorney filed a petition in juvenile court alleging neglect by Mother, and on January 7, 2016, the juvenile court entered an order continuing shelter care and placing Mother's daughters in the care and custody of the Department of Family Services (the Department) for placement in foster care. The girls were then placed in foster care with their former stepmother.

[¶8]   In September 2016, Mother was convicted of felony DUI for the January 4, 2016 incident, and she was sentenced to a prison term of six to seven years. On February 7,

---

[2] The charge was a felony because Mother had five prior DUI convictions in the ten years preceding her January 2016 arrest.

2

2018, the Department filed a petition to terminate Mother's parental rights to LDB, TJB, and JCB. As grounds for termination, the petition alleged:

10. Sheryl Ellis has been convicted numerous times of Driving While Under the Influence (DWUI). She attempted to drive the minor children home from school on January 4, 2016. Had a school official not stopped her, Sheryl Ellis would have driven the minor children while she was under the influence of alcohol. Sheryl Ellis was arrested and charged with a felony DWUI on January 4, 2016. She was convicted and sentenced to 6-7 years of incarceration for that DWUI in late September 2016. The minor children spent the night with their grandmother on January 4, 2016. On January 5, 2016, the minor children were taken into protective custody by law enforcement because Sheryl Ellis's January 4, 2016 arrest and incarceration left the minor children without a caretaker. The minor children now reside with their late father's wife, due to their grandmother not being in the best condition to fully take care of the minor children.

11. The minor children do not feel safe at Sheryl Ellis's residence due to her live-in boyfriend. The minor children have alleged sexual abuse by Sheryl Ellis and her live-in boyfriend, which allegations are under investigation.

12. On September 8, 2016, while on bond for her January 4, 2016 DWUI, Sheryl Ellis was arrested on another felony DWUI charge, failure to yield, hit and run, and various other charges. Throughout the duration of this case, Sheryl Ellis has been incarcerated and in different treatment facilities. Sheryl Ellis has a significant alcohol dependency and has not successfully completed treatment to address her dependency issues. Sheryl Ellis has also failed to complete her case plan.

13. The Agency has made reasonable efforts to reunify Sheryl Ellis with [the minor children], but those efforts have been unsuccessful. The Agency's reasonable efforts include, but are not limited to: developing a case plan with Sheryl Ellis; working towards the goals of the case plan; providing foster care placement of the minor children; participation and recommendations to the multidisciplinary team and juvenile court; and supervising the juvenile case.

14.    The Agency has also recommended evaluations and treatment for Sheryl Ellis's alcohol dependency, as well as mental health evaluations, which included a psychosexual evaluation.  Sheryl Ellis did participate in two treatment programs for her alcohol dependency as part of her DWUI criminal proceedings.  However, due to her actions while she was at the facilities, she was discharged from both programs before her completion dates and was returned to jail.

15.    Sheryl Ellis remains unable to care for [LDB, TJB, and JCB] due to her continued alcohol dependency and her inability to provide a stable life for [them].  The Agency is unable to return [the children] to the care and custody of Sheryl Ellis due to Sheryl Ellis's actions over the course of the juvenile case as well as her actions before the juvenile case began.

16.    The health and safety of [LDB, TJB, and JCB] would be jeopardized if they are returned to Sheryl Ellis's care.  Therefore, the parental rights of Sheryl Ellis to [LDB, TJB, and JCB] should be terminated under Wyoming Statute § 14-2-309(a)(iii).

17.    Sheryl Ellis has been sentenced to 6-7 years in prison and is currently incarcerated due to the conviction of a felony DWUI.  Sheryl Ellis is unfit to have custody and control of the minor children as demonstrated by her alcohol dependency, her failure to complete her case plan, her inability to provide a safe and stable living environment for the minor children, and her continued incarcerations.  Therefore, the parental rights of Sheryl Ellis to [LDB, TJB, and JCB] should be terminated under Wyoming Statute § 14-2-309(a)(iv).

18.    The minor children have been in the Agency's legal custody since January 5, 2016, approximately 24 months.  Sheryl Ellis is unfit to have the custody and control of the minor children as demonstrated by her alcohol dependency, her failure to complete her case plan, her inability to provide a safe and stable living environment for the minor children, as well as her continued incarcerations.  Therefore, the parental rights of Sheryl Ellis to [LDB, TJB, and JCB] should be terminated under Wyoming Statute § 14-2-309(a)(v).

4

19.   It would be in the best interests of the minor children for this Court to terminate the parental rights of the natural mother, Sheryl Ellis.

[¶9]   On June 29, 2018, the district court issued a scheduling order setting the trial to be conducted before a six-person jury as requested by Mother.  On October 3, 2018, the Department withdrew the ground for termination set forth in Wyo. Stat. Ann. § 14-2-309(a)(iii), and the case then proceeded on two grounds, Wyo. Stat. Ann. §§ 14-2-309(a)(iv) and (v).[3]  On November 26, 2018, a six-day jury trial began and resulted in a verdict that the Department had proved both grounds.  The court then heard argument on the best interests of the children and found that their best interests would be served by terminating Mother's parental rights.

[¶10] On December 11, 2018, the district court entered a written order terminating Mother's parental rights to LDB, TJB, and JCB.  Mother thereafter filed a timely notice of appeal to this Court.

---

[3] The statutory grounds for termination originally cited and those on which DFS proceeded to trial are stated as:

> a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
>
> * * * *
>
> (iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;
>
> (iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child;
>
> (v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2019).

## DISCUSSION

### A. Allocation of Peremptory Challenges

#### 1. Standard of Review

[¶11]  We review a district court's rulings on the allocation of peremptory challenges for an abuse of discretion.  *Smyth v. Kaufman*, 2003 WY 52, ¶ 13, 67 P.3d 1161, 1165 (Wyo. 2003) (citing *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 65 (Wyo. 1995)).  In determining whether the court abused its discretion, we consider whether it "could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Sparks v. State*, 2019 WY 50, ¶ 34, 440 P.3d 1095, 1106 (Wyo. 2019) (quoting *Moser v. State*, 2018 WY 12, ¶ 40, 409 P.3d 1236, 1248 (Wyo. 2018)).

#### 2. Framework for Allocating Peremptory Challenges

[¶12]  Wyo. Stat. Ann. § 1-11-202 (LexisNexis 2019) provides that "[i]n the trial of civil cases in the district courts of this state, each side is allowed three (3) peremptory challenges."  W.R.C.P. 47 provides:

> Each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the making of challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

W.R.C.P. 47(e).

[¶13]  The allocation of peremptory challenges depends on the sides to a dispute and how the parties are aligned.  We have said:

> Section 1-11-202 starts from the premise that each "side" to a controversy is entitled to an equal number of peremptory challenges. "Side," as that term is understood in the context of litigation, means "litigant or a group of litigants having essentially common interests."

*Wardell v. McMillan*, 844 P.2d 1052, 1060-61 (Wyo. 1992) (quoting *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 917 (Tex. 1979)).

[¶14]  A trial court's task in allocating peremptory challenges is to determine whether "a good-faith controversy" exists between multi-party litigants "regarding factual issues that will be determined by the jury."  *Cargill*, 891 P.2d at 64 (citing *Wardell*, 844 P.2d at 1061).

6

Only when such a good faith controversy is found will the parties' interests be considered antagonistic to each other, thus entitling them to separate peremptory challenges.

> Allocation of peremptory challenges, although resting within the sound discretion of the district court, still requires the district court to determine that a good faith controversy exists between multi-party litigants, be they plaintiffs or defendants, before peremptory challenges are awarded. This rule is intended to prevent multi-party litigants, on the same side, from stockpiling peremptory challenges if their interests are not antagonistic.

*Smyth*, ¶ 16, 67 P.3d at 1165 (quoting *Cargill*, 891 P.2d at 65).

[¶15]  We have explained the importance of preventing parties whose interests are not antagonistic to each other from pooling their peremptory challenges.

> Multi-party defendants' interests are antagonistic when a good-faith controversy exists, vis-a-vis each other, over an issue of fact which the jury will decide. *See Patterson Dental Company*, 592 S.W.2d at 918. When such a controversy exists, the defendants constitute separate "sides" within the meaning of § 1-11-202 and are entitled to have additional peremptory challenges. This result is justified by the rationale that certain of the extra challenges will be used to select a jury for the case against the other defendant, rather than against the plaintiff. *See* Daniel J. Sheehan, Jr. & Cynthia C. Hollingsworth, *Allocation of Peremptory Challenges Among Multiple Parties*, 10 St. Mary's L.J. 511, 530 (1979).

> When, on the other hand, no good-faith controversy exists between multi-party defendants and they are yet awarded extra peremptory challenges, the single-party plaintiff is placed in a distinct tactical disadvantage. The multi-party defendants, having no motive to exercise their additional challenges against a co-defendant, are able to pool their challenges against the plaintiff. As we have previously recognized, peremptory challenges are of substantial importance in constructing a fair and impartial jury. Theoretically, peremptory challenges may be used in an arbitrary and capricious manner. In practice, however, a party exercises peremptory challenges to reject jurors perceived to be unsympathetic to his case. To allow nonantagonistic, multi-

party defendants a two-, three- or four-to-one advantage in the exercise of peremptory challenges affords them undue influence over the composition of the jury and implicates the single-party plaintiff's right to a fair trial.

*Wardell*, 844 P.2d at 1061; *see also Roberts v. State*, 2018 WY 23, ¶ 10, 411 P.3d 431, 436 (Wyo. 2018) ("The peremptory challenge—that is, a party's removal of a potential juror without showing cause—lies at the heart of jury selection in the American trial.").

[¶16]   As we observed in *Cargill* and *Smyth*, these fair trial concerns are the same whether the multi-party litigants are plaintiffs or defendants.  *Smyth*, ¶ 16, 67 P.3d at 1165 (quoting *Cargill*, 891 P.2d at 65).   Additionally, the concerns are the same, and the analysis the same, when the parties bear titles other than plaintiff and defendant.   As another court explained:

> The parties to a termination proceeding are not referred to as plaintiffs and defendants. The petitioner is analogous to the plaintiff, and the parent, to the defendant. The question is whether the other persons, like the child, who participate in a termination proceeding should, depending on his or her position on the merits of whether grounds for termination exist, be viewed as a party to the action and as a plaintiff or defendant for purposes of peremptory challenge. In this case, as we understand it, the guardian ad litem has aligned himself with the petitioner (County) in the fact finding stage. In this situation the children might be treated as plaintiffs for purposes of selecting the jurors. Applying sec. 805.08(3) in this case, as sec. 48.31 appears to direct, would mean that the County and the children are several plaintiffs but one party and would therefore share peremptory challenges. *Cf. Keplin v. Hardware Mut. Cas. Co.*, 24 Wis.2d 319, 329-330, 129 N.W.2d 321, 130 N.W.2d 3, *reh'g denied*, 24 Wis.2d 319, 130 N.W.2d 3 (1964).

*In re C.E.W.*, 368 N.W.2d 47, 57 (Wis. 1985).[4]

[¶17]   In sum, when a court is confronted with multiple litigants, on either side and by whatever titles, it must allocate peremptory challenges based on the alignment of the

---

[4] In *C.E.W.*, the initial question before the Wisconsin court was whether the GAL was entitled to exercise peremptory challenges, and the court concluded it was, and that they should be shared with the county because the GAL was so aligned.  *C.E.W.*, 368 N.W.2d at 57.  In the case before us, Mother has not challenged the GAL's right to exercise peremptory challenges and that question is therefore one for another day.  In addressing the district court's allocation of challenges, we will assume without deciding that the GAL is entitled to exercise peremptory challenges.

litigants and a determination of whether their interests are antagonistic. In *Wardell*, we set forth a list of non-exclusive factors a trial court should consider in making that determination, including, as relevant here: the type of relationship among the litigants; information disclosed by pretrial discovery; and representations made by the parties. *Wardell*, 844 P.2d at 1061. We also recognized in *Wardell* that Rule 47 had been amended to allow a trial court discretion in allocating peremptory challenges to multi-party litigants, but we cautioned that such discretion must be exercised within established parameters.

> The Wyoming Supreme Court approved an amendment to W.R.C.P. 47, effective March 24, 1992, which, in addition to § 1-11-202, addresses the allocation of peremptory challenges in the multi-party context. W.R.C.P. 47(c) now reads as follows:
>
>> (c) Each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the making of challenges or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.
>
> The new rule adopts the law applicable to the federal courts. *See* 28 U.S.C. § 1870 (1988). The new rule does not alter our position that antagonism must be shown among multi-party defendants in the single-party plaintiff/multi-party defendant context prior to the allotment of additional peremptory challenges. The new rule may, however, afford the trial judge more discretion over how many extra peremptory challenges are appropriate under the circumstances and over how they should be exercised.

*Wardell*, 844 P.2d at 1060 n.8; *see also Smyth*, ¶ 16, 67 P.3d at 1165 (quoting *Cargill*, 891 P.2d at 65) ("Allocation of peremptory challenges, although resting within the sound discretion of the district court, still requires the district court to determine that a good faith controversy exists between multi-party litigants[.]").

[¶18] Against this framework we turn to our review of the district court's allocation of peremptory challenges in this case.

### 3.    **District Court's Ruling**

### a.    **District Court's Exercise of Discretion**

[¶19] The district court allocated four peremptory challenges each to the Department, Mother, and the GAL.[5]  Mother claims the district court erred in its allocation and that it should have equalized the allocation by either requiring the GAL to share peremptory challenges with the Department, or by allocating additional challenges to her.  We agree that the district court abused its discretion in allocating the peremptory challenges, but we are unable to find that the error was reversible.

[¶20] Mother first raised the issue of peremptory challenges in the final pretrial conference, where she argued that the Department and the GAL should be required to share peremptory challenges.

> Our position is they should have to share peremptory challenges.  Their interests are aligned.  They may have separate positions, but they both want to terminate the parental rights, so our position is that they should share.

[¶21]  Neither the GAL nor the Department disputed that their positions were aligned, but they both contended that because the GAL was permitted to fully participate in the trial, the GAL was entitled to the full number of peremptory challenges, separate from those allotted to the Department.  The district court agreed with them.

> I agree.  And the calculation as far as we know from our Supreme Court, regardless of the reasons for their alignment, which theoretically we don't know.  The guardian ad litem has to be here, and they're not a pleading party, but they are however a party for purposes of the matter before the Court.  They will be allowed separate peremptory challenges.

[¶22]  On November 16, 2018, the district court issued its written Order on Final Pretrial Conference, which confirmed that the Department, Mother, and the GAL would each have four peremptory challenges.  On November 21, 2018, Mother filed a written objection to the allocation of peremptory challenges, which cited relevant authority and again argued that the Department's and GAL's interests were aligned and not in any way antagonistic. Mother requested that the Department and GAL be given four peremptory challenges to

---

[5] One of the four peremptory challenges was allocated for the two alternate jurors the court seated.  *See* W.R.C.P. 47(d) ("Each side is entitled to one peremptory challenge in addition to those otherwise allowed by law if one or two alternate jurors are to be empanelled * * *.").

share or alternatively that she be given three additional challenges to regular jurors to level the field.

[¶23]   The GAL filed a response to Mother's objection.  As to the alignment of the interests of the Department and GAL, the GAL did not point to an antagonism between their interests but instead focused on the unique role of the GAL and the children in the proceeding.

> The minor children's role is actually much closer to that of a defendant in the technical sense of a plaintiff/defendant as they are responsive to a petition and do not initiate it or have a burden of proof to carry.  The District Court's November 14, 2018 ruling on the matter constitutes a recognition of the unique role the Minor Children play in an action for the termination of parental rights and appropriate use of its discretion in the normal allocation of peremptory challenges.

[¶24]   At the conclusion of jury selection, after the peremptory strikes had been exercised, Mother again raised her objection to the allocation of the challenges.

> [COUNSEL FOR MOTHER]:     It was a little bit unsettled Wednesday about an objection that we filed, but I do at this time want to renew my objection to the number of peremptory challenges that the Respondent was given in this case.
>
> THE COURT:       Okay.
>
> [COUNSEL FOR MOTHER]:     I would like it to be reflected on the record that had the Respondent been given additional peremptory challenges, while it's difficult because only 20 jurors were sat, potentially, would have also struck juror number 15, and potentially juror number 10.  Juror number 10 voiced concerns about mental health, and the number of second chances an individual should have.  And Ms. Brightman was the victim of a crime, and I want the Court to understand what would have happened had the Respondent had additional peremptory challenges.
>
> THE COURT:       First off, I appreciate the caution by all lawyers, but I have to indicate to you that I only rule once, and I did.  The motion was unnecessary.  The formal objection was unnecessary.  This is unnecessary, but I appreciate you trying to make a record.  If this was a criminal case, or a case in which

we somehow otherwise violated the selection process, it would be meaningful to note your other possible objections.

It is not meaningful and irrelevant. There wasn't a body of people in there you couldn't say you would or wouldn't have called. The record can't reflect harm. The harm you indicated you established by objecting to my apportionment of the selection. So I'm not – while I'm making clear you did it, and you're a conscientious attorney, and the record reflects it several ways, but I certainly can't accept that not striking Ms. Brightman or someone somehow created prejudice because of it, because there is no way to tell, because I didn't call enough jurors for you to do it.

So that's on me, but those decisions are supposed to be on me. So thank you, though, and with that, we'll enter into the courtroom.

[¶25] Before turning to our review of the district court's exercise of its discretion, we first address the Department's argument that Mother failed to preserve her claim for appeal. In so arguing, the Department relies on *Cargill*, in which we held that "a jury verdict cannot be attacked on the basis of improper allocation of peremptory challenges absent some indication, on the record, of which jurors the challenging party opposed." *Cargill*, 891 P.2d at 65. The Department contends that because Mother only identified jurors she would have *potentially* struck had she been granted additional challenges, her showing was inadequate to preserve her objection for appeal. We disagree.

[¶26] It is difficult to discern what Mother intended when she couched her final objection in terms of jurors she would have *potentially* struck. Nonetheless, through her objection she did specifically identify two jurors and that gives the Court some indication of the additional jurors she opposed. Given the clarity of her earlier objections to the allocation, and of her bases for her objections, we are unwilling to say under these circumstances that Mother's objections were insufficient to preserve the issue for this Court's review.

[¶27] We turn then to the district court's allocation of the peremptory challenges. The court based its allocation on the GAL's role in the termination proceeding, and reasoned that because the GAL was permitted to fully participate, it was entitled to its own separate and full allocation of peremptory challenges. As our above-discussed precedent establishes, however, that is not the relevant inquiry. The relevant inquiry is whether the litigants' interests are aligned and whether there exists a good faith controversy showing that their interests are antagonistic. *See Smyth*, ¶ 16, 67 P.3d at 1165 ("Allocation of peremptory challenges, although resting within the sound discretion of the district court,

12

still requires the district court to determine that a good faith controversy exists between multi-party litigants[.]").

[¶28] We also reject the GAL's argument that because of a GAL's unique role in a termination proceeding, it must always be considered a separate side entitled to its own peremptory challenges. An impartial jury, one not unfairly weighted against any one side, is every bit as important in a termination of parental rights proceeding as it is in any other civil proceeding. The allocation of peremptory challenges must therefore be based on the litigants' interests and alignments as reflected in the record, not on the role of a litigant or its theoretical interests. *See In re M.N.G.*, 147 S.W.3d 521, 531-32 (Tx. Ct. App. 2004) (trial court erred in allocating separate peremptory challenges to GAL and government in parental rights termination where no antagonism was found between their interests); *In re M.V.*, 422 N.W.2d 462 (Wis. Ct. App. 1988) (unpublished opinion) (rejecting separate role of GAL as basis to preclude its alignment with government in neglect proceeding); *C.E.W.*, 368 N.W.2d at 56-57 (acknowledging the GAL's important role in termination proceeding but requiring it to share peremptory challenges with the side with which it is aligned).

[¶29] Both the Department and the GAL argue that such a determination of the GAL's interests cannot be made before allocation of peremptory challenges, because until all evidence has been presented in a termination proceeding, the GAL will not know its position on termination or the recommendation it will make to the court. We suppose it may be conceivable that there could be a circumstance in which the GAL remained open on the question of termination until the close of evidence. We suspect, however, that those would be rare cases. Given the abuse-neglect proceeding and change in permanency plan which usually precedes a termination petition, and the amount of information amassed and exchanged during that proceeding and in discovery in the termination proceeding, it seems unlikely that there will be revelations during the trial that change the GAL's position on termination.[6]

[¶30] Regardless, as we indicated above, peremptory challenges are not allocated on the basis of a litigant's theoretical interest or position. They are to be allocated on the basis of what the record shows the litigant's interest and alignment to be, and in this instance, the record clearly reflected that the GAL was not open on the termination question. The GAL's pretrial memorandum stated:

> While the Guardian *ad Litem* does not have a burden of proof in the matter, the Guardian *ad Litem* is more closely aligned with the Petitioner and will adduce evidence reflective of the statutory grounds for termination of parental rights and to show

---

[6] Additionally, one wonders how the GAL could effectively exercise a peremptory challenge if she did not in fact have any idea what position to take until all of the evidence was produced at trial.

13

termination of Respondent Mother's parental rights is in the children's best interests.

[¶31]   Additionally, during the first of two pretrial conferences, the GAL took the position that testimony concerning the children's sexual abuse allegations should be admissible.  In the course of that, the GAL stated:

> I would say that this does glance though onto something that the GAL directly has to make sure is before the Court, and part of my responsibility through this – through the evidentiary phase is I have to get evidence of the client's wishes to the Court should the jury find there is convincing evidence to terminate parental rights, and that the fact that the children believe this happened, whether it did or didn't, is directly going to what they want, and why they don't want to return to their mother.

[¶32] The GAL's interests were clearly aligned with the Department's termination petition, and the record does not otherwise contain anything to suggest an antagonism between the GAL's and Department's interests.[7]  Under these circumstances, we must conclude that the district court abused its discretion in failing to require the Department and the GAL to share peremptory challenges.

b.   **Harmless Error Analysis**

[¶33]   The Department and GAL argue that even if the district court erred in its allocation of peremptory challenges, Mother has failed to show that the error prejudiced her and it was therefore not reversible.  We agree.

[¶34]   Mother argues that the district court's failure to equalize the peremptory challenges is reversible error per se.  In support of this argument, she cites *Wardell v. McMillan*, where this Court stated:

> Wardell argues that he should not be required to show how the improperly composed jury actually prejudiced his case because to do so would require conjecture and speculation. We agree and hold that the trial court's failure to afford the litigants with an extra peremptory challenge for alternate jurors under W.R.C.P. 47(b) constitutes reversible error when the error is

---

[7] The Department points to the disagreement between it and the GAL on whether the children's mental health records should be released as an interest on which they were not aligned.  The antagonism with which a trial court must concern itself, however, is not that concerning legal issues to be decided by the court, but rather concerning issues a jury must decide.  *Cargill*, 891 P.2d at 64.

properly preserved at trial and when the denial affects the composition of the jury actually called upon to deliberate the case.

Several considerations persuade us to apply the reversible-error rule. First, W.R.C.P. 47(b) afforded no discretion to the trial judge in granting an extra peremptory challenge to the litigants once he made the decision to seat alternate jurors. *Cf. State v. Jones*, 27 Wyo. 46, 191 P. 1075 (1920) (reversible error to allow prosecution an extra peremptory challenge beyond those mandated by statute). Second, it is axiomatic that all litigants are entitled to a fair trial. The touchstone of a fair trial is the right to have an impartial decision maker. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). When the decision maker is to be a jury, impartiality is achieved in Wyoming through the exercise of challenges for cause and peremptory challenges. *See* Wyo.Stat. §§ 1-11-202 to -203 (1988) and W.R.C.P. 47(b). A trial court's refusal to excuse a juror for cause upon a proper showing of bias or denial of a peremptory challenge afforded by law implicates a litigant's substantial interest in, and right to, impanel an impartial jury. *Cf. Patterson v. State*, 691 P.2d 253 (Wyo. 1984), *cert. denied*, 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985) (dilution of defendant's statutory allotment of peremptory challenges by trial court's failure to properly excuse juror for cause held to be reversible error). Third, requiring the complaining party to show the existence of actual prejudice would ask him "to discover the unknowable and to reconstruct what might have been and never was[; *i.e.*,] a jury properly constituted after running the gauntlet of challenge[s] performed in accordance with the prescribed rule[s] of the game." *Kentucky Farm Bureau Mutual Insurance Company v. Cook*, 590 S.W.2d 875, 877 (Ky.1979). Finally, the law generally disfavors any attempt to invade the internal processes of a decision maker for the purpose of impeaching a verdict. *See* W.R.E. 606.

*Wardell*, 844 P.2d at 1059 (footnote omitted).

[¶35] Mother's reliance on the reversible-error rule announced in *Wardell* is misplaced. First, we applied the reversible-error rule in that case only to the trial court's failure to allocate an extra peremptory challenge for the alternate jurors, which is a mandatory

allocation over which a court has no discretion. *Wardell*, 844 P.2d at 1059. We did not hold that the reversible-error rule would apply to a trial court's exercise of discretion in allocating peremptory challenges for the deliberating jurors.

[¶36]  More importantly, since *Wardell*, this Court's views on the required showing of harm in the case of an error in denying challenges to jurors has shifted.  In *Klahn v. State*, 2004 WY 94, ¶ 19, 96 P.3d 472, 483 (Wyo. 2004), the Court overruled its precedent holding that the erroneous denial of a for-cause challenge to a juror was reversible error without a showing of prejudice.  The issue in *Klahn* was the erroneous denial of a challenge for cause, but the Court's focus was on the interference with the defendant's peremptory challenges, which he was required to use to remove the juror that he argued should have been removed for cause. *Klahn*, ¶ 13, 96 P.3d at 480. The Court noted a sea change in this area of law and considered the different approaches taken by other jurisdictions in determining whether the error was reversible.  *Id.* ¶ 18, 96 P.3d at 481-83.  It then held that a harmless error standard of review should apply.

> Peremptory strikes do not implicate any constitutional right. *Martinez–Salazar*, 528 U.S. at 313, 120 S.Ct. at 780. *Green v. Maynard*, 349 S.C. 535, 564 S.E.2d 83, 86 (2002); *Lindell*, 629 N.W.2d at 251-52. The concept of harmless error is recognized by rule in Wyoming. *See* W.R.Cr.P. 52(a) ( "Harmless Error: Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *see also* W.R.A.P. 9.04. It simply does not make any sense to require a new trial where a verdict is constitutionally sound. We examine error for harmful effect in other situations, including those where the claim of error is statutorily or constitutionally based. *See generally*, *Hannon v. State*, 2004 WY 8, ¶ 11, 84 P.3d 320, ¶ 11 (Wyo. 2004) ("Restrictions on the right to confront witnesses are subject to the harmless error analysis."); *Belden v. State*, 2003 WY 89, ¶ 50, 73 P.3d 1041, ¶ 50 (Wyo. 2003) ("A deprivation of the right to be present at all critical stages of a trial is subject to harmless error analysis."); *Simmons v. State*, 2003 WY 84, ¶ 15, 72 P.3d 803, ¶ 15 (Wyo. 2003) (prosecutorial misconduct reviewed for harmless error); *Urbigkit v. State*, 2003 WY 57, ¶¶ 30-31, 67 P.3d 1207, ¶¶ 30-31 (Wyo. 2003) (failure to swear jury pursuant to Wyo. Stat. Ann. § 7-11-107 can constitute harmless error); and *Lewis v. State*, 2002 WY 92, ¶ 26, 48 P.3d 1063, ¶ 26 (Wyo. 2002) ("The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis."). ***Accordingly, we hold that a harmless error analysis will apply to a defendant's use of peremptory***

> ***challenge to cure a trial court's erroneous denial of a
> challenge for cause and overrule our precedent to the extent
> that it espouses an automatic reversal rule***.

*Klahn*, ¶ 19, 96 P.3d at 483 (emphasis added).

[¶37]   Before *Klahn*, our cases held that, with respect to the erroneous denial of a for-cause challenge, "as long as the defendant exhausted his peremptory challenges and preserved the error by refusing to accept the panel, reversal was automatic regardless of whether the defendant suffered actual prejudice." *Klahn*, ¶ 16, 96 P.3d at 480.  After *Klahn*, our rule is that absent a showing of prejudice, a defendant's use of peremptory challenge to cure a trial court's erroneous denial of a challenge for cause does not constitute reversible error. *Id.* ¶ 21, 96 P.3d at 484; *see also Castellanos v. State*, 2016 WY 11, ¶ 103, 366 P.3d 1279, 1306 (Wyo. 2016) (applying *Klahn* harmless error analysis to denial of for-cause challenge); *Moore v. State*, 2013 WY 120, ¶ 15, 309 P.3d 1242, 1245-46 (Wyo. 2013) (applying *Klahn* harmless error analysis to ineffective assistance claim based on trial attorney's failure to challenge juror for cause).

[¶38]   Given our reasoning in *Klahn* and its focus on prejudice related to a party's forced use of peremptory challenges, we see no reason that the harmless error rule adopted there should not also extend to a trial court's abuse of discretion in allocating peremptory challenges.[8]  *See* 7 Wayne R. LaFave et al., *Crim. Proc.* § 27.6(b) n.23 (4th ed. Dec. 2019 update) (noting different approaches to wrongful denial of peremptory challenge and opining that "[t]he better rule is that no substantial right is impaired so long as the jury that actually sits is impartial").  The *Klahn* harmless error analysis requires the following showing:

> To show prejudice, a defendant must show that his use of a peremptory challenge to cure the denial of the challenge for cause was harmful error, meaning "there is a reasonable possibility that the verdict might have been more favorable to the defendant" if he had not been forced to so use the peremptory challenge. *Klahn*, ¶ 20, 96 P.3d at 483. To make that showing, the defendant must demonstrate "that the jury was not impartial and that he was denied a fair trial." *Id*. ¶ 20, 96 P.3d at 484.

*Castellanos*, ¶ 104, 366 P.3d at 1306.[9]

---

[8] The question of a trial court's non-discretionary error in denying peremptory challenges for alternate jurors is not at issue here, and we therefore do not address the question of whether *Klahn* overruled the reversible-error standard the Court adopted in *Wardell* for such an error.

[9] This analysis is consistent with our longstanding rule that a nonconstitutional error is not reversible if the evidence of guilt is overwhelming.  *See Brown v. State*, 953 P.2d 1170, 1177 (Wyo. 1998) ("A

[¶39]   In *Klahn*, we found that the trial court erred in denying one of the defendant's for-cause challenges to a juror, but in applying the required harmless error analysis, we found no prejudice to the defendant in his forced use of peremptory challenges.

> There is nothing in the record to indicate that any of the jurors who served on the panel were not qualified to serve. All of the jurors—including the two identified by Klahn as likely recipients of a peremptory challenge if he had had one available—were passed for cause. We find no abuse of discretion by the district court in those determinations. Since there is no demonstration by Klahn that the jury was not impartial and that he was denied a fair trial, he cannot meet his burden of showing harmful error.

*Klahn*, ¶ 20, 96 P.3d at 483-84.

[¶40]   In *Castellanos*, we did not address whether the trial court erred in denying two for-cause challenges because the defendant failed to show he was prejudiced by the forced use of peremptory challenges. *Castellanos*, ¶ 109 n.11, 366 P.3d at 1307 n.11.

> Mr. Castellanos has not made the showing required for reversible error. First, Mr. Castellanos passed both Juror No. 153 and Juror 420 for cause. We have recognized that this is certainly a strong indication of the jurors' impartiality[.]
>
> * * * *
>
> Additionally, with respect to Juror No. 420, Mr. Castellanos' stated concern was the juror's willingness to

---

nonconstitutional error, as in the case of erroneous admission of similar act evidence, is harmless if it is 'highly probable' that the error did not contribute to the verdict. Where there is overwhelming evidence of guilt, . . . erroneous evidentiary rulings on such collateral matters are often harmless.") (quoting *Bishop v. State*, 687 P.2d 242, 246 (Wyo. 1984)); *see also Rivera v. Illinois*, 556 U.S. 148, 155-56, 162, 129 S.Ct. 1446, 1452, 1456, 173 L.Ed.2d 320 (2009) (upholding Illinois Supreme Court finding of no reversible error in the denial of a peremptory challenge where defendant made no showing of bias and any rational trier of fact would have found defendant guilty based on evidence); *State v. Hickman*, 68 P.3d 418, 426 (Ariz. 2003) ("[An automatic reversal] forces trial courts to retry cases previously decided by fair juries. . . . Hickman admitted to investigators that he had images of child pornography on his computer at work, his home computer, and on computer diskettes he had at home. A new trial would be an exercise of form over substance; a new jury will reach the same result as the first. The point of harmless error review is to avoid such incongruous consequences."); *People v. Jones*, 720 N.Y.S.2d 509, 510-11 (N.Y. App. 2001) (error in denying defendant's peremptory challenge was nonconstitutional error and harmless where evidence against defendant was overwhelming).

consider mitigation evidence. Given that the jury did not impose the death penalty, Mr. Castellanos' concerns did not come to pass and he suffered no harm from the presence of this juror on the jury.

With respect to Juror No. 153, Mr. Castellanos alleges that his presence on the jury was harmful because Juror No. 153's wife used to work for the Laramie County District Attorney's Office and his mother still worked there, suggesting a potential bias, and he indicated on his jury questionnaire that according to what he had heard about the case, it sounded like Mr. Castellanos was guilty. Mr. Castellanos further points out that Juror No. 153 served as jury foreman, making his presence particularly harmful. We find these allegations insufficient to show that Juror No. 153 was unable to render a fair and impartial verdict.

Juror No. 153's wife stopped working at the Laramie County District Attorney's Office in 2009, and his mother's current employment there is a tenuous connection on which to find bias. That connection is made even more tenuous by the fact that the Laramie County office was not prosecuting the case. The Natrona County District Attorney was serving as special prosecutor, and the Laramie County office simply had no role. With respect to Juror No. 153's statement on the jury questionnaire, his answers during *voir dire* alleviated concerns regarding his impartiality. He indicated that based on his background as an auditor, he tends "not to make a decision or form an opinion on something until I—until I see data or evidence to, you know, help me in that decision." He also responded that he did not expect Mr. Castellanos to prove anything to him when asked that question. Given this record, Mr. Castellanos has not shown that Juror 153 was unable to render a fair and impartial verdict.

Mr. Castellanos did not make a showing that Jurors Nos. 153 and 420 were unable to render a fair and impartial verdict. He therefore has failed to establish reversible error in the forced use of his peremptory challenges to remove jurors he contended should have been dismissed for cause.

*Castellanos*, ¶¶ 105-09, 366 P.3d at 1306-07 (footnote omitted).

[¶41] Mother likewise has made no showing of prejudice, i.e., that the jury was not impartial due to participation by the jurors she would have stricken. She passed the jury for cause, including the two jurors she indicates would have been stricken if she had been allocated additional peremptory challenges. Moreover, she has not attempted on appeal to show how the presence of the two jurors she would have struck may have affected the manner in which the evidence before the jury was viewed or what particular concern she had with the jurors in relation to the evidence, which, if valid concerns existed, could have been based on responses to detailed questions that could have been asked in voir dire. Finally, she has not challenged the sufficiency of the evidence supporting the grounds for termination or argued that the evidence made it a close call. Because Mother has not shown or even claimed that the jurors whom she would have stricken could not be fair and impartial in this case, and our review of the record shows the evidence in support of termination to be overwhelming, we find no reversible error under the rule set forth in *Klahn* and *Castellanos*.[10]

## B. Testimony Concerning Children's Sexual Abuse Allegations

[¶42] The district court allowed testimony concerning the children's sexual abuse allegations against Mother and her boyfriend and excluded evidence concerning whether the allegations had been substantiated. Mother contends these rulings violated W.R.E. 404(b) and W.R.E. 403. We find no error.

## 1. Standard of Review

[¶43] We review a district court's rulings on the admissibility of evidence for an abuse of discretion.

> We review a district court's ruling on the admissibility of evidence for an abuse of discretion. *Farrow v. State*, 2019 WY 30, ¶ 52, 437 P.3d 809, 823 (Wyo. 2019). "We afford considerable deference to a trial court's rulings on the admissibility of evidence, and we will not disturb the trial

---

[10] We fully understand that a showing of partiality normally cannot be made by testimony by a juror about the jury's deliberations. A juror affidavit or testimony concerning the impact of evidence on his or any other juror's mind or emotions or concerning his mental processes is generally incompetent and may not be relied upon to make the required showing of harm absent proof that extraneous prejudicial evidence was brought to the jury's attention or that outside influence was improperly brought to bear on any juror. W.R.E. 606(b); *see also Smyth*, ¶¶ 44-45, 67 P.3d at 1174-75. There is an exception, in limited circumstances not at issue here, where a criminal defendant claims that a juror's racial animus contributed to a guilty verdict. *See Pena-Rodriguez v. Colorado*, ___ U.S.___, 137 S.Ct. 855, 869, 197 L.Ed.2d 107 (2017) ("[W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.").

court's ruling if there is a legitimate basis for it." *Id*. "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Moser v. State*, 2018 WY 12, ¶ 40, 409 P.3d 1236, 1248 (Wyo. 2018) (quoting *Triplett v. State*, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017)).

*Sparks*, ¶ 34, 440 P.3d at 1106.

## 2.     District Court's Ruling

[¶44]   Concerning the evidence of the children's sexual abuse allegations, the district court ruled:

> Respondent's *Motion in Limine to Exclude Testimony or Evidence of Sexual Abuse Allegation and Motion to Strike Amanda Turlington as an Expert* is **DENIED**.  The evidence of sexual abuse, however weak the evidence may be from Respondent's point of view is relevant to unfitness.  It is direct evidence, not character evidence subject to analysis under WRE 404, nor is it more prejudicial than probative.  The parties are however **ORDERED IN LIMINE** not to admit evidence of the status of any investigation or comment on whether any conclusion can be drawn by inaction of law enforcement or prosecutors.

[¶45]   With respect to Mother's claim that evidence of the children's sexual abuse allegations was admitted in violation of W.R.E. 404(b), Mother offers no substantive analysis.  She instead makes the conclusory assertion that had the district court done a Rule 404(b) analysis, it would have found the evidence inadmissible "because its reliability was extremely questionable making it more prejudicial than probative."  We need not consider Mother's Rule 404(b) argument because it is not supported by cogent argument.  *In Interest of DT*, 2017 WY 36, ¶ 29, 391 P.3d 1136, 1145 (Wyo. 2017) (quoting *Peak v. Peak*, 2016 WY 109, ¶ 11, 383 P.3d 1084, 1088 (Wyo. 2016)) ("We consistently have refused to consider arguments not supported by cogent argument and citation to legal authority.").

[¶46]   In any event, however, the district court was correct that this was not Rule 404(b) evidence.  Rule 404(b) bars evidence of wrongs admitted "to prove the character of a person in order to show that he acted in conformity therewith."  W.R.E. 404(b).  That was not the reason for admitting evidence of the children's sexual abuse allegations.  The evidence was admitted to show Mother's unfitness to parent, and it is the type of evidence we have held is relevant and admissible in termination proceedings.

The statute requires the district court make a finding of a parent's unfitness at the time of the termination proceedings; however, the court need not ignore evidence of the parent's previous unfitness. *In re KMJ*, [2010 WY 142,] ¶ 17, 242 P.3d [968] at 971 [(Wyo. 2010)]. "Evidence of a parent's past behavior is 'plainly relevant in determining current parental fitness.'" *In re AGS*, [2014 WY 143,] ¶ 24, 337 P.3d [470] at 478 [(Wyo. 2014)] (quoting *HJO v. State of Wyo., Dep't of Family Servs.* (*In re KMO*), 2012 WY 99, ¶ 19, 280 P.3d 1203, 1211 (Wyo. 2012)). Therefore, "'[i]t is appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated.'" *In re KMJ*, ¶ 17, 242 P.3d at 971 (quoting *JLW* [*v. CAB,* 2010 WY 9], ¶ 24, 224 P.3d [14] at 20 [(Wyo. 2010)]).

*Matter of BAD*, 2019 WY 83, ¶ 17, 446 P.3d 222, 226 (Wyo. 2019).

[¶47] We also reject Mother's argument that the district court erred in excluding evidence of whether the allegations had been substantiated or were under investigation. First, Mother did not identify a witness who would testify as to any investigation into the allegation or make an offer of proof. We have said:

There is only one prudent way for an offer of proof to be made at trial. The attorney who seeks to offer evidence, which has been refused or to which an objection has been upheld, should take the initiative. The offer of proof should then take the form of counsel's eliciting the proposed testimony directly from the witness, or entering the tangible evidence in the record, all outside of the hearing of the jury.

*Carrier v. State*, 2017 WY 88, ¶ 26, 400 P.3d 358, 365 (Wyo. 2017) (quoting *Bloomfield v. State*, 2010 WY 97, ¶ 23, 234 P.3d 366, 375 (Wyo. 2010)).

[¶48] Because Mother did not make an offer of proof, she has made her claim of error difficult for this Court to review.

Because Appellant's attorney did not preserve this issue by offering the evidence and then making an offer of proof if it was refused, his assertion that the district court somehow erred is without merit. Beyond that, without an offer of proof, we have no realistic means of evaluating whether it might have been admissible and whether failure to receive it could have

been prejudicial. *Guy-Thomas v. Thomas*, 2015 WY 35, ¶ 12, 344 P.3d 782, 786 (Wyo. 2015).

*Carrier*, ¶ 27, 400 P.3d at 365.

[¶49] Moreover, the district court provided a sound basis for its concerns with the evidence:

> I'm equally concerned that nobody mentions that there's no charges, because of course, that's a function of the executive branch and it's still pending. And I'm concerned that anybody says it's been investigated and turned down. It's just not the case. The only way to address that is to call what, the prosecuting attorney? And they're all going to say, sure, we prosecute five and ten, fifteen-year-old cases all the time, and it just becomes a very difficult proposition. So it would be my intention, even if I let it in, to order you both in limine concerning any criminal investigations, any charges pending or otherwise, or any conviction – of course that wouldn't be true even, but the girls says [sic] it, she gets evaluated, she recants, or didn't, she gets evaluated by the jury. They're the fact finder.

[¶50] The district court's concerns are well-founded, and its approach was not unreasonable. Mother was able to cross-examine the children who testified, as well as the counselors, and ultimately it was a question for the jury as to whether they believed the allegations. Testimony regarding the status of any investigation into the children's allegations would have introduced an unnecessary and potentially confusing side issue into the proceeding. Based on the record before us, we find no abuse of discretion in the court's ruling.

## CONCLUSION

[¶51] As to Mother's first claim of error, we hold that the district court abused its discretion in failing to consider the alignment of the Department's and GAL's interests before allocating peremptory challenges, but that the improper allocation was not shown to be reversible error. As to Mother's second claim of error, we find no abuse of discretion in the court's rulings concerning evidence of the children's sexual abuse allegations. Affirmed.

23

**FOX**, **Justice**, specially concurring, in which **BOOMGAARDEN**, **Justice**, joins.

[¶52]   I agree that no reversible error occurred in this case.  I write separately to express the view that the single most important factor in determining whether a party was prejudiced by an error resulting in an unfair distribution of peremptory challenges is the strength of the case against her.

[¶53]   I agree that a trial court's abuse of discretion in allocating peremptory challenges does not require automatic reversal.  The majority correctly notes the "sea change" that has occurred in this Court and others on "the required showing of harm in the case of an error in denying challenges to jurors[.]"  Several states that once subscribed to the view that erroneous deprivations of peremptory challenges required reversal (regardless of prejudice) no longer adhere to that rule.  *See, e.g.*, *Willis v. State*, 820 S.E.2d 640 (Ga. 2018) (overruling precedent to hold that a defendant is not presumptively harmed by erroneous failure to excuse juror for cause resulting in use of peremptory strike); *People v. Novotny*, 320 P.3d 1194, 1196 (Colo. 2014) (overruling precedent "requiring automatic reversal as the remedy for any erroneous ruling on a challenge for cause adversely impacting [] ability to shape the jury through peremptory challenges"); *State v. Hickman*, 68 P.3d 418 (Ariz. 2003) (overruling precedent requiring automatic reversal when defendant uses peremptory strike to remove prospective juror that should have been removed for cause and applying harmless error); *Robinson v. State*, 255 P.3d 425 (Okla. Crim. App. 2011) (overruling precedent holding that failure to afford peremptory challenges to which defendant was statutorily entitled required automatic reversal and applying harmless error review).

[¶54]   In part, we can attribute this shift to a series of United States Supreme Court decisions discussing the constitutional significance of the curative use of peremptory challenges resulting from erroneous denials of for-cause challenges.[11]  *See Willis*, 820 S.E.2d at 704; *Novotny*, 320 P.3d at 1201-02; *Hickman*, 68 P.3d at 420-22.  In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Court held that a state law effectively compelling a defendant to use a peremptory challenge to cure an erroneous denial of a for-cause challenge did not violate the Sixth and Fourteenth Amendments.  The Court reasoned "that peremptory challenges are not of constitutional dimension"; rather, "it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise."  *Id.* at 88-89, 108 S.Ct at 2278-79.  In *United States v. Martinez-Salazar*, 528 U.S. 304, 317, 120 S.Ct. 774, 782, 145 L.Ed.2d 792

---

[11] This shift can also be attributed to the development and evolution of harmless-error review generally. *See, e.g.*, *Novotny*, 320 P.3d at 1200 ("The evolving decision to treat some kinds of error as harmless has been termed 'the most far-reaching doctrinal change in American procedural jurisprudence since its inception.' . . . By the time of our finding of 'inherent prejudice' in [another case], the mandate of [our criminal and appellate rules] to disregard any error or defect not affecting substantial rights was already well-accepted, but the more precise distinction between trial error, which can be harmless, and structural error, which cannot, was yet in its infancy.") (internal citations omitted).

(2000), the Court held that a federal "defendant's exercise of peremptory challenges pursuant to [federal rule] is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." Finally, in *Rivera v. Illinois*, 556 U.S. 148, 156, 129 S.Ct. 1446, 1452-53, 173 L.Ed.2d 320 (2009), the Court "granted certiorari [] to resolve an apparent conflict among state high courts over whether the erroneous denial of a peremptory challenge requires automatic reversal of a defendant's conviction as a matter of federal law." (citing *Angus v. State*, 695 N.W.2d 109, 118 (Minn. 2005) (applying automatic reversal rule); *State v. Vreen*, 26 P.3d 236, 238-40 (Wash. 2001) (same); *People v. Bell*, 702 N.W.2d 128, 138-41 (Mich. 2005) (rejecting automatic reversal rule and looking to state law to determine the consequences of an erroneous denial of a peremptory challenge); *People v. Rivera*, 879 N.E.2d 876, 884-91 (Ill. 2007) (same)). The Court held:

> Absent a federal constitutional violation, States retain the prerogative to decide whether such errors . . . require automatic reversal. States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*. Or they may conclude, as the Supreme Court of Illinois implicitly did here, that the improper seating of a competent and unbiased juror does not convert the jury into an ultra vires tribunal; therefore the error could rank as harmless under state law.

*Rivera*, 556 U.S. at 161-62, 129 S.Ct. at 1456.

[¶55] After the United States Supreme Court's decisions in *Ross* and *Martinez-Salazar*, but before *Rivera*, this Court "overruled its precedent holding that the erroneous denial of a for-cause challenge to a juror was reversible error without a showing of prejudice" in *Klahn v. State*, 2004 WY 94, ¶ 19, 96 P.3d 472, 483 (Wyo. 2004). We held harmless error review should apply to a defendant's use of a peremptory challenge to cure a trial court's erroneous denial of a challenge for cause. *Id.* Today, the majority extends *Klahn* "to a trial court's abuse of discretion in allocating peremptory challenges." In both circumstances, there are good reasons to forgo automatic reversal and apply a harmless error standard of review:

> The general object [of harmless error review is] simple, to substitute judgment for automatic application of rules; to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record.

25

3B Fed. Prac. & Proc. Crim. § 852 (4th ed.) (Aug. 2019 Update); *see also* Majority Opinion at ¶ 36 (citing *Klahn*, 2004 WY 94, ¶ 19, 96 P.3d at 483).

[¶56]   Yet, as the majority recognizes, a strict application of the test adopted in *Klahn* and *Castellanos* to the unfair distribution of peremptory challenges creates a standard that is nearly impossible to meet. *Castellanos v. State*, 2016 WY 11, ¶ 104, 366 P.3d 1279, 1306 (Wyo. 2016) (requiring the defendant to "demonstrate 'that the jury was not impartial and that he was denied a fair trial'" to show prejudice) (quoting *Klahn*, 2004 WY 94, ¶ 20, 96 P.3d at 484).   Those cases dealt with the use of peremptory challenges as a result of the wrongful denial of a challenge for cause, thus giving rise to a slightly different analysis than the analysis required for the issue before us, the unfair distribution of peremptory challenges.[12]   In either circumstance, however, the difficulty of proving that the jury who ultimately decided the case was not impartial remains the same.   Other courts have recognized:

> The peremptory challenge is used precisely when there is no identifiable basis on which to challenge a particular juror for cause. By its very nature, the peremptory challenge is a tool that may be wielded in a highly subjective and seemingly arbitrary fashion, based upon mere impressions and hunches. Although a litigant may suspect that a potential juror harbors an unarticulated bias or hostility, that litigant would be unable to demonstrate that bias or hostility to an appellate court reviewing for harmless error. Similarly, the government would be hard-pressed to bear its burden of proving that the seating of a peremptorily challenged juror did not harm the defendant. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777-78, 123 L.Ed.2d 508 (1993) (under harmless error review, government bears the burden of persuasion with respect to prejudice). It would be difficult if not impossible for a reviewing court to determine the degree of harm resulting from erroneously allowing a juror to sit despite an attempted peremptory challenge.
>
> Another obstacle to harmless-error review of an erroneous denial of peremptory challenge is the dearth of

---

[12] For instance, when peremptory challenges are improperly allocated, it would not be necessary for a party to object to a juror for cause or to the jury as empaneled in order to preserve the issue of prejudice. *See also Wardell v. McMillan*, 844 P.2d 1052, 1059 (Wyo. 1992) ("impartiality is achieved in Wyoming through the exercise of challenges for cause *and* peremptory challenges") (emphasis added).   Conversely, when the issue is curative use of a peremptory challenge on a juror that should have been removed for cause, the analysis will necessarily require a party to object to a juror for cause.

information concerning what went on in the jury room. To subject the denial of a peremptory challenge to harmless-error analysis would require appellate courts to do the impossible: to reconstruct what went on in jury deliberations through nothing more than post-trial hearings and sheer speculation. In the context of an appeal based on denial of a peremptory challenge, there is inadequate evidence for an appellate court to determine the degree of harm resulting from the seating of a juror despite a defendant's attempted peremptory strike.

*United States v. Annigoni*, 96 F.3d 1132, 1144-45 (9th Cir. 1996), *overruled by Rivera v. Illinois*, 556 U.S. 148, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009), *as recognized in United States v. Lindsey*, 634 F.3d 541, 548-49 (9th Cir. 2011)[13]; *see also Novotny*, 320 P.3d at 1206 (Hood, J., concurring in part and dissenting in part) (Determining whether such an error substantially influenced the verdict or impaired the fairness of the trial is "virtually impossible" in part because the "reviewing court would be forced to focus . . . on the general attributes of the jurors who ultimately decided the case. That analysis, apart from being inherently conjectural, . . . would be further complicated by well-established law restricting inquiry into the validity of verdicts."); *Com. v. Noel*, 53 A.3d 848, 864 (Pa. Super. Ct. 2012) (Wecht, J., dissenting) ("[T]o demand a showing of prejudice when the issue is how a criminal defendant would have used one or more of his peremptory challenges had not the trial court patently violated the rules governing jury selection is to render a right provided to criminal defendants by Pennsylvania law a 'mere abstraction,' and, consequently, a nullity. . . . The majority suggests that no remedy will lie absent a demonstration of actual prejudice, a demonstration that can never be made[.]") (emphasis omitted).

[¶57]   It is this futility that led many courts to adopt a rule of automatic reversal in the first instance.[14]  *See Laura A. Newman, LLC v. Roberts*, 365 P.3d 972, 980 (Colo. 2016) ("[A]s

---

[13] In *Lindsey*, the Ninth Circuit concluded it could no longer apply *Annigoni's* automatic reversal rule after the United States Supreme Court's decision in *Rivera* because the Ninth Circuit is "not a separate sovereign that may freely prescribe remedies to our own laws absent a federal constitutional violation"; rather, it is "an intermediate court within the federal system, and . . . must take [its] cue from the Supreme Court." *Lindsey*, 634 F.3d at 550. Because the Supreme Court concluded no federal constitutional violation occurred in *Rivera*, the Ninth Circuit concluded *Annigoni's* reasoning had been "fatally undercut" in federal court. It acknowledged, however, that *Rivera* left the states free to decide the proper remedy for the error at issue. *Id.*

[14] The majority expressly declines to address whether *Klahn* overruled our decision in *Wardell*, 844 P.2d 1052. I agree the specific issue raised by the circumstances in *Wardell* is not before us and we need not decide *Wardell's* continued viability. I do note, however, one statement in *Wardell* that certainly remains true: "requiring the complaining party to show the existence of actual prejudice would ask him to discover the unknowable and to reconstruct what might have been and never was; i.e., a jury properly constituted after running the gauntlet of challenges performed in accordance with the prescribed rules of the game." *Id.* at 1059 (internal quotation marks and alterations omitted).

we recognized over a century ago, the effect of errors like those at issue on the ultimate result of a trial is a matter of pure conjecture and is not for the trial court, or even this court, to make a guess at. . . . Indeed, our inability to assess the impact of such errors is precisely why we adopted the automatic reversal rule in the first place[.]") (Gabriel, J., dissenting) (internal quotation marks omitted); *King v. Special Res. Mgmt., Inc.*, 846 P.2d 1038, 1042 (Mont. 1993) ("If we require a showing of prejudice . . . we cannot evaluate the effect of an improper grant of peremptory challenges without invading the internal processes of a jury."). It remains the reason several courts continue to apply the automatic reversal rule today. *McCoy v. State*, 112 A.3d 239, 258 (Del. 2015) (holding mistaken denial of a peremptory challenge requires automatic reversal in part because "[a]ny other conclusion would leave [the defendant] without a remedy for the erroneous denial of his right to exercise a peremptory challenge"); *State v. Mootz*, 808 N.W.2d 207, 225-26 (Iowa 2012) (holding court's erroneous ruling on a reverse-*Batson* challenge leading to denial of a peremptory challenge requires automatic reversal because "[a]ny other conclusion would leave the defendant without a remedy"); *State v. Campbell*, 772 N.W.2d 858, 862 (Minn. App. 2009) (holding "automatic reversal remains the appropriate remedy when a trial court erroneously denies a defendant's peremptory challenge, even after . . . *Rivera*" because an "erroneous denial of a peremptory challenge . . . does not lend itself to harmless error analysis") (quoting *State v. Reiners*, 664 N.W.2d 826, 835 (Minn. 2003) ("This difficulty stems from the reviewing court's inability to follow the challenged juror into jury deliberation to determine his or her effect.")); *see also People v. Hecker*, 942 N.E.2d 248, 272 (N.Y. 2010) (holding that mistaken denial of a peremptory challenge "under New York law mandates automatic reversal," despite the United States Supreme Court's holding in *Rivera*); *Com. v. Hampton*, 928 N.E.2d 917, 927 (Mass. 2010) ("We continue to adhere to the view that, for purposes of State law, the erroneous denial of a peremptory challenge requires automatic reversal, without a showing of prejudice."). In short, the requirement that a party erroneously deprived of a peremptory challenge demonstrate that the jury ultimately selected is not impartial converts the problematic rule of automatic reversal into the equally problematic rule of automatic affirmance. *Novotny*, 320 P.3d at 1203-04 (Hood, J., concurring in part and dissenting in part) ("The majority fails to explain how a defendant can ever demonstrate prejudice. . . . [It] thus has replaced [the] rule mandating automatic reversal with a rule seeming to mandate automatic affirmance."). That result reinstates the very practice harmless error doctrine seeks to cure: the automatic application of rules in place of reasoned judgment. *See supra* 3B Fed. Prac. & Proc. Crim. § 852.

[¶58] Thus, I would exercise our state-law prerogative to decide the manner in which we review errors such as those at issue here and hold that the single most important factor in determining whether the error resulted in prejudice is the weight of evidence against the party unfairly deprived of a peremptory challenge.[15] This approach, instead of requiring a

---

[15] "As a threshold to demonstrating [] harm, however, the complaining party must exhaust all of her own peremptory challenges and request additional challenges." *Carrano v. Yale-New Haven Hosp.*, 904 A.2d 149, 163 (Conn. 2006). Absent that exhaustion, a party "stands in no position to complain that it was

party to show what it cannot (that the seated jury was not impartial), would look primarily to the strength of the evidence supporting the verdict in the context of the entire record. *See Bogard v. State*, 2019 WY 96, ¶ 72, 449 P.3d 315, 332 (Wyo. 2019) ("The single most significant factor in determining whether Mr. Bogard was prejudiced by the prosecutorial misconduct is the strength of the State's case against him."); *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634 (Wyo. 2017) ("In determining whether Mr. Hathaway was prejudiced, we review the entire record. . . . Perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant.") (internal quotation marks and alteration omitted). We "should be especially loath to regard any error as harmless in a close case, since even the smallest error may have been enough to tilt the balance[.]" 3B Fed. Prac. & Proc. Crim. § 854 (4th ed.) (Aug. 2019 Update) (citing *Glasser v. United States*, 315 U.S. 60, 67, 62 S.Ct. 457, 463-64, 86 L.Ed. 680 (1942) (when "the scales of justice may be delicately poised between guilt and innocence" an "error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swung the scales"), *superseded by rule on other grounds, as recognized in Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)). Conversely, we may more freely disregard an error in the jury selection process if the evidence against the aggrieved party was overwhelming, "since the outcome would almost surely have been the same regardless of the error." 3B Fed. Prac. & Proc. Crim. § 854. This overwhelming-evidence approach strikes a middle ground between the inflexible automatic-reversal and automatic-affirmance dichotomy.

[¶59] Here, the record plainly contains clear and convincing evidence supporting the alleged grounds for termination of Ms. Ellis's parental rights, and she has made no attempt to convince us otherwise. *See* Majority Opinion ¶¶ 1-10. I would affirm on that basis.

---

deprived of the right to challenge [other jurors]." *Id.* at 164 (quoting *Connecticut Mut. Life Ins. Co. v. Hillmon*, 188 U.S. 208, 212, 23 S.Ct. 294, 295, 47 L.Ed. 446 (1903)).